**Electronically Filed
Supreme Court
SCWC-11-0000573
17-SEP-2015
07:45 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Petitioner-Respondent/Plaintiff-Appellant/Cross-Appellee,

vs.

PATRICK W. DEGUAIR, JR.,
Respondent-Petitioner/Defendant-Appellee/Cross-Appellant,

and

ARYSS DAYNE K. KAMAI, Respondent-Defendant.

SCWC-11-0000573

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-11-0000573; CR. NO. 08-1-0533)

SEPTEMBER 17, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case arises from the murder of Jermaine Duckworth. On March 27, 2008, Duckworth's body was discovered at the foot of a cliff on Yokohama Bay, a beach near Ka'ena Point on the island

of Oʻahu, Hawaiʻi.

On April 9, 2008, Patrick W. Deguair, Jr., was indicted for Duckworth's murder and kidnapping, as well as firearms charges and other offenses, as follows:  (1) Murder in the Second Degree, in violation of Hawaiʻi Revised Statutes (HRS) §§ 707-701.5 (2014) and 706-656 (2014) (Count I); (2) Kidnapping, in violation of HRS §§ 707-720(1)(d) (2014) and/or 707-720(1)(e) (2014)[1] (Count II); (3) two counts of Carrying or Use of Firearm in the Commission of a Separate Felony, in violation of HRS § 134-21 (2011) (Counts III and IV); (4) Place to Keep Pistol or Revolver, in violation of HRS § 134-25 (2011) (Count V); (5) Promoting a Dangerous Drug in the Third Degree, in violation of HRS § 712-1243 (2014) (Count VI); and (6) Unlawful Use of Drug Paraphernalia, in violation of HRS § 329-43.5(a) (2010) (Count VII).[2]  Only Counts I through IV are at issue in this appeal.

In two separate trials, the State attempted to prove that Deguair was the individual who shot and killed Duckworth. The alleged motive was that Deguair suspected Duckworth had made statements to police implicating Deguair in a 2007 home robbery. The defense's theory was that Deguair was innocent of all charges

---

[1]     Deguair's alleged offenses were committed on March 27, 2008. Although HRS § 707-720 was subsequently amended during the legislative session of 2008, the changes do not affect the sections of HRS § 707-720 with which Deguair was charged.  2008 Haw. Sess. Laws Act 147, § 2 at 391.

[2]     The indictment separately charged co-defendant Aryss Dayne K. Kamai (Kamai) under Counts VIII through X, and Kamai pled guilty to these counts before Deguair's first trial.

2

and "the real murderer was David Teo and his friends."

Both trials ended in mistrial on the counts now before this court. In the second trial, Deguair was tried on Counts I through IV only. The jury indicated that it could not reach a verdict on Counts I, III, and IV, and the circuit court declared a mistrial on those counts. Although the jury appeared to reach a unanimous verdict of guilty on Count II, the circuit court concluded that the jury's failure to reach a unanimous result on a related interrogatory meant that the jury was in fact hung on Count II, and so the circuit court declared a mistrial on that count as well. The circuit court discharged the jury.

Later that night, the circuit court concluded that it had erred by not accepting the verdict on Count II. The circuit court reconvened the jurors eight days later, questioned them regarding their votes, and accepted the guilty verdict as to Count II. Shortly thereafter, a juror contacted the circuit court regarding possible misconduct by the jurors during the trial. After questioning all twelve jurors, the circuit court determined that the jury deliberations had been tainted by juror misconduct.

The circuit court granted Deguair's motion to dismiss Counts I, III, and IV under State v. Moriwake, 65 Haw. 47, 647 P.2d 705 (1982). The circuit court also granted Deguair's motion to vacate Count II based on the juror misconduct but denied his motions to dismiss Count II under Moriwake. Instead, the circuit

3

court ordered a retrial on Count II.  In addition, the circuit court rejected Deguair's objections to recalling the jury.

On appeal, the Intermediate Court of Appeals (ICA) affirmed the circuit court's orders on Counts I through IV.  The ICA explicitly stated it did not need to address whether the circuit court erred in recalling the jury because the circuit court had vacated the conviction on Count II.

Both the State and Deguair applied for certiorari.  The State argues that the ICA erred in concluding that the circuit court did not abuse its discretion by granting Deguair's motion to dismiss Counts I, III, and IV.

Deguair argues that the ICA erred in ruling that a retrial on Count II was not barred by double jeopardy, and in failing to address whether the trial court erred in recalling the jury.

For the reasons set forth below, we affirm the judgment of the ICA.

### I.  Background

### A.  First trial proceedings

This case first proceeded to jury trial before the circuit court in October 2009.[3]  The first trial lasted eight and one-half days, and after jury deliberations of seven days, the circuit court entered a finding of "manifest necessity" and

---

[3]     The Honorable Michael A. Town presided.

declared a mistrial as to Counts I through V because the jury could not reach a unanimous verdict. There were no objections from either counsel. It is undisputed that the jurors in the first trial were evenly split on Counts I through IV, with six jurors voting "not guilty" and six jurors voting "guilty" on each count.

The jury also returned verdicts acquitting Deguair on Counts VI and VII, and the circuit court later granted the State's motion for <u>nolle prosequi</u> without prejudice as to Count V. The circuit court also denied Deguair's first motion to dismiss the indictment as to Counts I through IV. Therefore, Counts I through IV remained.

## B.    Second trial proceedings

The second trial, which is presently at issue, commenced on March 7, 2011.[4]  The presentation of evidence began on March 10, 2011, and continued for eight days. The evidence from the second trial was substantially similar to the evidence from the first trial, except that Ju Wong Woo and Duckworth's brother, James Duckworth,[5] testified at the second trial only. Teo and Woo were the State's key witnesses. Deguair also testified.

Teo testified that around midnight on March 27, 2008,

---

[4]    The Honorable Glenn J. Kim presided.

[5]    James testified that Deguair accused Duckworth of implicating Deguair in a 2007 home robbery. James also testified that Deguair had twice threatened him and Duckworth.

he saw Deguair bring Duckworth to a sport utility vehicle (SUV) and that Duckworth's mouth was covered with duct tape, and his arms were taped behind his back. When they arrived at Yokohama Bay, Teo heard Woo tell Deguair to shoot Duckworth. Teo testified that he saw Deguair shoot Duckworth and kick him off the cliff, all without untaping Duckworth.

Woo testified that he did not tell Deguair to shoot Duckworth, but that he saw Deguair point a gun at Duckworth's head and heard a gunshot, though he looked away before the gun fired. Woo also testified that Deguair did all of this without untaping Duckworth.

Deguair testified that he taped Duckworth at the direction of Teo, and that he untaped Duckworth before putting him in the back of the SUV. Deguair testified that he drove until Teo told him to pull over in Nānākuli, and that Teo walked off with Duckworth, leaving Deguair and Woo at the SUV. Deguair testified that more than an hour later, Teo returned alone. The apparent implication of this testimony was that Teo murdered Duckworth.

Duckworth's body was discovered that day by a lifeguard, who testified there was no duct tape on Duckworth's body. The photographs taken of Duckworth's body at Yokohama Bay, which were received into evidence, did not show any tape on Duckworth's body. In addition, the doctor who conducted an autopsy of Duckworth's body found adhesive residue on Duckworth's

arms and hand.  Three additional witnesses testified that Deguair taped Duckworth.

Jury deliberations began on March 31, 2011, and continued for two and one-half days.  On April 5, 2011, the jury notified the circuit court via "Communication No. 4 from the Jury" that it was "unable to come to a unanimous decision on Counts 1, 3, and 4, and is unlikely to do so."  The circuit court, with concurrence of both counsel, responded by asking whether more time would assist the jury in reaching a unanimous verdict on Counts I, III, and IV.  The jury responded in "Communication No. 5 from the Jury" that "[n]o, the jury has unanimously decided that more time will not help."

In "Communication No. 6 from the Jury," the jury asked, "[c]an the jury submit its verdict for Count #2 even though it is not unanimous on the interrogatory questions?"  The circuit court, with concurrence of both counsel, answered:

> If the interrogatory questions you are referring to are the questions on page 32[6] of the jury

---

[6]    Page 32 of the jury instructions states:

If you find that the prosecution has proven beyond a reasonable doubt that the Defendant committed the offense of Kidnapping, then you must also answer the following three questions on a special interrogatory which will be provided to you:

1.   Has the prosecution proven beyond a reasonable doubt that prior to trial the Defendant did not release Jermaine Duckworth voluntarily?

2.   Has the prosecution proven beyond a reasonable doubt that prior to trial the Defendant did not release Jermaine Duckworth alive and not

(continued...)

7

> instructions, then you may not return a verdict on
> Count 2.
>
> If, however, the interrogatory questions you are
> referring to are not those on page 32, then please
> advise the court exactly what interrogatory questions
> you are referring to.

The circuit court reconvened with the parties outside of the presence of the jury. The circuit court reviewed the jury communications it had received thus far, including Communication Nos. 4, 5, and 6, and the circuit court's responses. At the close of this discussion, the circuit court explicitly asked both

---

[6](...continued)
> suffering from serious or substantial bodily
> injury?
>
> 3. Has the prosecution proven beyond a reasonable
> doubt that prior to trial the Defendant did not
> release Jermaine Duckworth in a safe place?
>
> Your [sic] must answer each of these questions
> separately. Your answer to each of these questions
> must be unanimous.

Though not included in the jury instructions, HRS § 707-720(1) provides, in pertinent part:

> (1) A person commits the offense of kidnapping if the
> person intentionally or knowingly restrains another
> person with intent to:
>
> . . .
>
> (d) Inflict bodily injury upon that person or subject
> that person to a sexual offense;
>
> (e) Terrorize that person or a third person
>
> . . . .
>
> (2) Except as provided in subsection (3), kidnapping
> is a class A felony.
>
> (3) In a prosecution for kidnapping, it is a defense
> which reduces the offense to a class B felony that the
> defendant voluntarily released the victim, alive and
> not suffering from serious or substantial bodily
> injury, in a safe place prior to trial.

(Emphases added).

counsel if they had "anything for the record on anything the court just put on the record?" Both counsel stated that they had nothing further for the record.

In "Communication No. 7 from the Jury," the jury stated, "Re. Communication #6, the jury is not unanimous on Question #2 on p. 32 . . . ." The circuit court again reconvened with counsel outside the presence of the jury. The circuit court stated:

> [s]o they are not unanimous on all three of the questions on page 32, as they have to be to return a verdict. So basically, no matter what they did with that verdict form, the court will not be accepting a verdict on Count number II. The upshot of that is it looks like they're hung on all four counts essentially. It's going to be a mistrial declared on all counts again.

(Emphases added).

The Deputy Prosecuting Attorney (DPA) indicated the State was ready for the circuit court to bring in the jurors.

Defense counsel, however, questioned whether and how the jurors' votes would be determined.

> MR. HUNT: Your Honor, are we going to be able to determine from the record where they stand?
>
> THE COURT: I'm going to go in and talk to them right after we finish.
>
> MR. HUNT: Because I think it would be--
>
> THE COURT: I'm going to go and talk to them right after we finish because I need to get that at least from them. And I--
>
> MR. HUNT: Thank you.
>
> THE COURT: I normally talk to them anyway. And then you know the rules, counsel. I mean you can talk to them if you want to afterwards. I'm not going to make them wait around though.

> MR. HUNT: Are you going to ask them where they--
>
> THE COURT: Well, I'll just--
>
> MR. HUNT: --numerically stand?
>
> THE COURT: I'll just tell them sometimes the attorneys like to talk to the jurors. <u>You can talk to them if you want to, and I'm going to leave it up to you.</u>
>
> MR. HUNT: <u>As far as where they stood numerically?</u>
>
> THE COURT: Oh, no. <u>No, that, I'm going to ask specifically.</u>
>
> MR. HUNT: <u>You're going to ask. Okay, that would be fine. I'd appreciate that.</u>
>
> THE COURT: That, <u>I'm going to ask them specifically.</u> Obviously, I think it's germane. And <u>I'll report it to both of you, too. As soon as I find out, I'll let you know.</u>

(Emphases added).

The DPA raised concerns about his availability to speak with the jurors.

> MR. BELL: I'd like to just inform the court that after the verdict--well, after the decision is received and the court makes the appropriate findings and makes its declaration and we take care of other procedural matters, I do have another matter before another court at 3 o'clock, and I don't want to keep that other court waiting. I just say that because if it was the defense [sic] intention to speak with the jurors after the court has concluded its conversation with them, I cannot say that I would be immediately available and ready to do so. I say that because I'm going to be in another courtroom. But if it is the defense intention to speak with the jurors, if they choose to do so before they disperse, then I'll stay and--
>
> THE COURT: <u>Well, you guys work that out, because as you know, you can talk to them--both counsel don't have to be there. You can call them up days later if they're willing to speak to you, I mean, you know, because the rules had changed a long time ago on all of that, and I think you're both aware of the ethical rules as far as that goes. So that, you need to work out among yourselves.</u> I will tell you this. I am not going to have them stay in the jury room and bring one or both of you in. <u>I'm going to talk to them, and then I'm going to release them.</u> And then it's up to you, I mean if you want to wait in the hall there,

> catch them as they come out or something.  Whatever
> you guys want to do is up to you, but I'm just going
> to leave that to you all, okay?
>
> Okay, bring them in.

(Emphases added).

After the jurors were called into the courtroom, the foreperson confirmed that the jury was "unable to reach a unanimous verdict as to Counts I, III, and IV" and that "more time would not help the jury to reach a unanimous decision on those counts."

With respect to Count II, the foreperson handed to the bailiff what the jurors "believe[d] to be" their verdict, noting, "[w]hether or not it would be accepted or not is the question."

The circuit court called both counsel to the bench, where the following discussion occurred outside the presence of the jury:

> THE COURT:  Everything else except those three is
> blank, as it should be, because they were unable to
> reach unanimous verdicts.  I'm showing counsel--for
> the record, I'm showing counsel the three verdict
> forms that the jury did fill out.  They are Count II,
> kidnapping, the interrogatories for Count II, and also
> the interrogatory on the enhanced sentencing for use
> of a firearm for Count II.
>
> For the record, they returned a verdict of
> guilty on Count II.  However--and I will clarify this
> with them in a second--they checked off 1 and 3 "Yes"
> on the interrogatories but just made dashes in number
> 2 along with their last jury communication.  And I
> will confirm that, for the record, that means they
> were not unanimous on that question.  And the interrog
> as to firearms kind of is moot, but they were not
> unanimous as to that one either.
>
> So what I intend to do for the record is to
> clarify that, in fact, they were not able to reach
> unanimous answer as to question number 2 of the three
> interrogatories pertaining to kidnapping and that, in
> fact, they were not able to reach a unanimous verdict

as to the use--well, possession of a firearm or semiautomatic firearm.  And given that, <u>I am not going to receive the verdict as to Count II.</u>  That's the court's intention.

Mr. Bell.

MR. BELL:  I understand that, Your Honor.  I'd ask the court to consider the following.  What the court has presented is what the parties, I believe, inferred what was going to transpire.  <u>For the purpose of establishing kidnapping as a class A, the prosecution only has to establish one of those three has been proven beyond a reasonable doubt.</u>  Before they reach the interrogatories, they have to establish as a matter of fact that the defendant knowingly or intentionally restrained Jermaine, and then there's those two alternatives.  <u>Only after they've made a unanimous finding as to the two counts of kidnapping-- two elements of kidnapping do they consider the interrogatories.</u>

So the prosecution is asking the court to consider this.  Inasmuch as they've already reached a verdict as to the kidnapping as charged, questions of fact, and they do not reach the interrogatories until they made those findings and because they found at least as to one question a unanimous verdict as to yes, then there is a factual basis for the court to receive that verdict as to kidnapping as a class A felony.

THE COURT:  Mr. Hunt.

MR. HUNT:  Your Honor, can I see the verdict form again.

No, I disagree.  <u>I agree with the court's position.</u>

THE COURT:  Okay, you made your record on that--

MR. BELL:  Thank you.

THE COURT:  --Mr. Bell.  <u>I believe all three questions have to be answered unanimously in the affirmative, and they're simply not.  I think that's required under the applicable statutes as contained in the Penal Code.  So as I say, you've made your record.  I'm respectfully not going to accept the verdict on Count number II, and I'm going to declare a mistrial due to manifest necessity on all four counts.</u>

MR. BELL:  I understand, Your Honor.

Just on the last point, is the court's reading of 707-720 that each of the three questions have to be answered in the affirmative?  Is that what the court just said?  I thought--I mean the law is one of the

12

> three, not all three.  That's just the prosecution's
> perspective.  I just want to understand‒‒
>
> THE COURT:  No‒‒
>
> MR. BELL:  ‒‒what the court said.
>
> THE COURT:  ‒‒I'm not going to commit myself to an
> answer on that.  I am saying that on the verdict form
> which the jury was provided with, the clear
> instructions to them is that the answer to each of
> these questions must be unanimous, and one of them was
> not.  So, you know, I suppose you can file a writ
> seriously if you feel strongly enough about it.  And
> if the appellate‒‒the Supreme Court agreed with you,
> then maybe you could reinstate‒‒maybe they would
> reinstate the verdict in Count II.  After all, the
> verdict is in unambiguously, and it'll be preserved
> for the record.  But at this point, I'm going to
> declare a mistrial.  I'm not going to accept the
> verdict.  <u>I'm going to declare a mistrial on Count II
> as well as the other three counts, and we'll take it
> from there.</u>
>
> MR. BELL: Thank you.

(Emphases added).

In the presence of the jury, the circuit court further

discussed with the foreperson the verdict form on Count II.

> THE COURT:  Okay . . . just so the record is very
> clear, on the verdict form containing the three
> interrogatories pertaining to Count II, the "Yes" box
> is checked off very clearly and unequivocally on
> questions 1 and 3.  However, question number 2, there
> are just a couple of dash marks after both "Yes" and
> "No."  And <u>my understanding based on your
> communication to the court on this issue is that the
> jury was unable to reach a unanimous verdict as to
> question 2, is that correct?</u>
>
> THE FOREPERSON:  <u>Correct.</u>
>
> . . . .
>
> THE COURT:  All right.  <u>Well, in that case, then, I'm
> not going to receive the verdict as to Count II.</u>  And
> because the jury has informed the court and all of us
> on the record just now that, despite their efforts,
> they're unable to reach a unanimous verdict as to
> Counts I, III, and IV, <u>I'm going to find manifest
> necessity, and I'm declaring a mistrial as to all four
> counts in this case, Counts I, II, III, and IV.</u>

(Emphases added).

Thus, the circuit court did not accept the jury's guilty verdict as to Count II, and declared a mistrial based upon "manifest necessity" on all four counts. There were no objections made by either counsel, and both counsel indicated they had nothing further for the record. Because the circuit court did not accept the verdict as to Count II, the circuit court did not poll[7] the jury with respect to Count II at that time.

The circuit court indicated it would meet with the jurors in the jury room, and twice stated that the jury was "discharged." The circuit court did not instruct jurors to refrain from discussing the case with others or that they could potentially be recalled.

The circuit court then scheduled a retrial, and there were no objections made by either counsel.

## C. Jury recall and misconduct proceedings

Later that night, the circuit court concluded that it had erred in not accepting the guilty verdict on Count II. The circuit court contacted counsel and "start[ed] gathering jurors

---

[7]   Under Hawaiʻi Rules of Penal Procedure Rule 31© (2015), "Poll of Jury,"

> [w]hen a verdict is returned and before it is recorded, the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, or there is not concurrence by the number of jurors stipulated to as being necessary for returning a verdict, the jury may be directed to retire for further deliberations or may be discharged.

14

up" for recall. There is no evidence in the record that the circuit court informed the jurors that they were not to discuss the case with others. Due to "unavailability of counsel because of prior commitments," the circuit court was unable to meet with counsel regarding this issue until April 7, 2011, which was two days after discharging the jury.

At the April 7, 2011 chambers conference, the circuit court informed counsel that it believed it had made a mistake by not accepting the jury's verdict on Count II because the jurors were required to vote unanimously in the affirmative on only one of the three interrogatory questions on the verdict form to submit a guilty verdict on Count II as a class A felony. The circuit court also indicated its intention to "gather the jury members, go back on record and poll them, and then depending on the results of the poll, proceed from there." The circuit court scheduled the proceeding for April 13, 2011, and invited counsel to "file anything respective counsel wanted to on this issue." The circuit court contacted all of the jurors, who "were all amenable to coming back at this day and time."

Deguair's objections to the circuit court's recall of the jury for the purposes of polling (Objections to Recall and Polling) were filed on April 11, 2011. The State responded to Deguair's objections.

Without ruling on Deguair's Objections to the Recall and Polling, the circuit court reconvened the jury on April 13,

2011. Before the jurors were called into the courtroom, the circuit court stated that on April 5, 2011, the jurors were "deadlocked six to six" on Counts I, III, and IV.

The DPA asked:

> [W]ill [t]he Court be open to confirming that on April 5, 2011, after the jury was discharged, that this Court, in fact, did speak with the jurors in the jury room, as it indicated that it was going to do so, and during that conversation, the Court was able to determine where the jurors stood on all counts, including Count 2? Will the Court confirm that?

The circuit court answered, "[n]o, because I think that's tantamount to making myself a witness in this case, and I'm not going to do that."

Defense counsel raised concerns about the jurors' potential exposure to "publicity" regarding the case.

> MR. HUNT: And my concern is since the jury was discharged almost ten days ago, you know, eight or nine days ago, there has been publicity. I did attach as an Exhibit A to my memo the fact that there was publicity, and there was a notation that there was an earlier murder. I think, it was in 2002 that Mr. DeGuair [sic] was a suspect in but was not prosecuted because there were no witnesses to testify and so forth. So, I'm concerned that the jury has had extraneous influence now that--
>
> THE COURT: Potentially.
>
> MR. HUNT: Yes, yes. After--
>
> THE COURT: I mean, you know, just--we don't know in fact that any of them--
>
> MR. HUNT: True.
>
> THE COURT: --that's all I'm saying.
>
>      Go on.
>
> MR. HUNT: And I agree with the Court. We don't know unless we ask. And, I suppose, to be careful, I think, we should probably do some inquiry--at least, I'm making that request--what the jury has since exposed themselves to since being discharged, whether

16

> they've gone on the internet and read newspapers and looked up the case and things. But, the bottom line is, with all due respect, I think the Court, once it discharged the jury, lost the power to call it back and ask it to poll--to poll it and to render a true verdict.
>
> THE COURT: No. Certainly, I understand your point. And as I say, in the fullness of time, you may be vindicated. I, frankly, am not sure. I would note just, sort of, parenthetically that, again, I don't know whether--how much water this will carry or, for example, how much it would make a difference to an appellate court looking at this. But, I would, like I said, note parenthetically that, you know, your client and defendants in his position have a right to a jury poll under the Hawaiʻi rules of penal procedure. It's not a constitutional right.
>
> MR. HUNT: Correct.

(Emphases added).

The circuit court, again over defense counsel's objection, questioned the jury as to whether they agreed with the guilty verdict on Count II and Interrogatory Nos. 1 and 3 relating to Count II. Each juror answered in the affirmative. The circuit court also asked the jurors whether their responses would have been the same if the circuit court had asked for their numerical split on April 5, 2011. The jurors answered in the affirmative. The circuit court did not ask the jurors whether they had been exposed to publicity or discussed the case with others. The circuit court accepted the jury's verdict on Count II and adjudged Deguair guilty of kidnapping as a Class A felony.

Later that day, on April 13, 2011, the circuit court received a telephone voice mail message from Juror No. 4. The message stated the following:

> [JUROR 4]: I was in the jury of Patrick Deguair trial, No. 4. Um, I had some concerns, and I was-I

17

> didn't know who to talk to.  And it probably happens all the time.
>
> But I really--during deliberation, I really suspected that people looked at the Internet 'cause things came out that weren't in trial, and it really bothers me.  And I think some--and I think there was a fear factor for some of these jurors.
>
> And if you're going to retry this, somehow--you know, you're not--it's going to come out the same way because people are going to be too scared.  It's too small of an island.  I know you--you didn't have that --you tried to put that fear out of our heads, but I-- I have a concern.
>
> I don't know, um--I don't know what you can do about it except sequester, but I think that people did--did just go right on and looked and found out stuff.

The circuit court reconvened to question Juror No. 4 on April 15, 2011.  Juror No. 4 testified that Juror No. 1[8] said "she was not going to get up in open court and say guilty." Juror No. 4 also reported three instances of possible juror misconduct:  (1) statements made by Juror No. 1 during deliberation of the jury that there was "documented evidence" that Deguair had threatened four people, suggesting that Juror No. 1 had consulted outside sources of information[9]; (2) mention of the name of a "Samoan gang" that may have been involved, which Juror No. 4 claimed had not come to light during the trial; and (3) Juror No. 1 had conducted her own experiment by putting duct tape on her forearm to see if it left residue marks, the result of which experiment Juror No. 1 reported to other jurors.

The other jurors were subsequently questioned

---

[8]     Juror No. 1 served as the foreperson.

[9]     Juror No. 1 later testified that she did not make this statement.

18

individually.  Five other jurors corroborated Juror No. 4's testimony that Juror No. 1 had said that she would not say Deguair was guilty in open court.

Juror No. 1 confirmed that she had been concerned about gang membership and being the target of retaliation.  When the circuit court asked about the jurors' "fear of being on a hit list" and "the mention of Samoan gangs," Juror No. 1 explained:

> A     ... [W]ell, it's probably because people--people have told us or we've seen on TV where you're--if you're the identifiable person, the foreperson, that maybe there's repercussions after.  And so people were afraid.
>
> Q     Were they afraid that they might be killed or murdered by someone associated with a Samoan gang?
>
> A     Well, those words didn't really come up, but it was just you'd get attacked or, you know, targeted.  So when we started picking our foreperson, one person specifically said, I absolutely do not, cannot, don't want to be it for these reasons.  And then I even said, Okay, me too.  For that reason, I don't want to do it.  And so it kind of--how the discussion went.  And then we ended up doing it randomly.  So we picked numbers out of a bag.

Five other jurors recalled hearing statements regarding fear of reprisal should the jury find Deguair guilty and the consequences of being the foreperson.

Regarding the duct tape experiment, Juror No. 1 testified that, after the first day of deliberations, "I wanted to validate the residue part of the evidence that was in the picture, how that would happen.  So I took tape and I stuck it on my forearm and waited ten minutes and then pulled it off, and that was it."

Further, Juror Nos. 4 and 8 confirmed that after the

jury was discharged but before the jury was recalled, they did research Deguair on the internet. Juror No. 4 testified that she found Deguair had allegedly threatened other people in the past. Juror No. 8 testified that she found Deguair had supposedly murdered someone else.

## D.    Post-trial motions

Two separate motions by Deguair were filed in the circuit court on April 28, 2011. Both motions are at issue on certiorari. First, Deguair moved to dismiss Counts I through IV with prejudice (Second Motion to Dismiss) based on the factors set forth in State v. Moriwake, 65 Haw. 47, 56-57, 647 P.2d 705, 712-13 (1982). Deguair argued that five of the six Moriwake factors weighed against retrial, while the "severity of the offense charged" did not weigh against retrial. Deguair further submitted that if the circuit court were to grant his motion to vacate the conviction on Count II, it should also dismiss Count II with prejudice, rather than grant a new trial on Count II because the evidence that the State would lawfully be permitted to present in a third trial on Count II would be "substantially restricted" by the dismissals of Counts I, III, and IV.

Deguair's counsel also argued:

On April 7, 2011, the Court held a chambers conference with counsel for the parties and informed the parties that the Court believed it made a mistake by not accepting the jury's verdict on count II because the jury only needed to be unanimous on one of the three questions on the verdict form in order for the Court to accept the jury's verdict on count II as a class A felony, and over defendant's objection decided to

20

reconvene the jury on April 13, 2011, to accept the jury's verdict on count II and poll the jury. The Court also informed counsel in chambers that it met with the jury for approximately and [sic] hour to an hour and a half after discharging the jury to answer questions from jurors and determine where the jurors stood on the deadlocked counts. The Court informed counsel the jurors were evenly split, six for guilty and six for not guilty on counts I, III and IV.

In opposition, the State argued that five of the six Moriwake factors weighed in favor of retrial. The State did not dispute defense counsel's statement that the jury was evenly split, six-to-six. Indeed, the State represented that on April 6, 2011, "the State received a phone call from the court's law clerk/bailiff, who informed the State of the jury's vote as to each count, including the kidnapping special interrogatories." In a footnote, the State represented, "[i]t is the State's understanding that, as to counts 1, 3 and 4, the jury was split evenly at 6/6."

Second, Deguair moved to vacate the conviction on Count II and dismiss Count II with prejudice (Motion to Vacate and Dismiss Count II) based on the juror misconduct. Deguair requested that the circuit court dismiss Count II under Moriwake, rather than grant a new trial. Deguair argued:

> [E]ven standing alone each of the improper instances of jury behavior described above warrant vacating the kidnapping conviction and granting a new trial on the kidnapping count. Defendant further submits, however, that the collective effect of the jury's improper conduct makes it impossible for the State to prove that the jurors' misconduct was harmless beyond a reasonable doubt. Defendant was clearly denied a trial by a fair and impartial jury on the kidnapping charge and the only fair and just result should be that kidnapping conviction be vacated, and rather than granting a new trial, Count 2 must be dismissed with prejudice, based on State v. Moriwake . . . .

21

(Citation omitted).

In other words, Deguair appeared to argue that juror misconduct prejudiced the jury's deliberations as to Count II, but that because the circuit court should not have recalled the jury to receive a guilty verdict on Count II, the circuit court should dismiss Count II under Moriwake as if the jury were deadlocked on Count II.

In opposition, the State argued (1) there was no "concrete evidence" that Juror No. 1 obtained information from outside the trial; (2) the comments regarding the threats and Samoan gangs did not prejudice Deguair; (3) Juror No. 1's duct tape experiment did not prejudice Deguair because whether there was adhesive residue on Duckworth's body was irrelevant to the kidnapping; and (4) Moriwake did not apply to Count II because the jury was not deadlocked on Count II.

The circuit court held a hearing on both motions on May 18, 2011. The circuit court first addressed and heard arguments regarding the Motion to Vacate and Dismiss Count II. The circuit court orally granted the motion to vacate the conviction on Count II, but denied the motion as to dismissal of Count II, stating "[t]he proper remedy is a new trial, and that's what I'm ordering."

As to the Second Motion to Dismiss, the circuit court stated, "it's the Court's considered judgment that the chances of the State persuading 12 jurors unanimously to find the defendant

guilty as charged of Counts 1 and 3 and 4 are virtually nil." The circuit court orally granted Deguair's Second Motion to Dismiss. At the hearing, the State did not dispute or put on contradictory evidence that the second jury was deadlocked six-to-six.

On July 1, 2011, the circuit court entered two separate orders on the motions that confirmed its oral rulings. The circuit court granted in part the Second Motion to Dismiss with respect to Counts I, III, and IV, and denied in part the Second Motion to Dismiss with respect to Count II (Second Dismissal Order). The circuit court also granted Deguair's request to vacate his conviction on Count II but denied his request to dismiss Count II with prejudice pursuant to <u>Moriwake</u> (Order re Motion to Vacate and Dismiss Count II). The Second Dismissal Order and Order re Motion to Vacate and Dismiss Count II contained findings of fact and conclusions of law, which are discussed as relevant below.

The circuit court denied and overruled Deguair's Objections to Recall and Polling (Order re Recall and Polling) in an order entered on August 26, 2011.

**E.   ICA proceedings**

In the ICA, the State appealed the Second Dismissal Order, and on cross-appeal, Deguair appealed the Order re Motion to Vacate and Dismiss Count II and the Order re Recall and Polling.

23

In its July 31, 2014 Summary Disposition Order (SDO), the ICA affirmed the Second Dismissal Order and Order re Motion to Vacate and Dismiss Count II.  Because the circuit court vacated the conviction on Count II, the ICA did not address the circuit court's recall of the jury.

With respect to the State's appeal, the ICA held:

> [t]he Circuit Court carefully considered and weighed each of the Moriwake factors in light of all of the particular circumstances of this case, including the juror misconduct in the second trial, and the seriousness and potential impact of that misconduct on the deliberations of the second hung jury. Notwithstanding the State's challenges to certain aspects of the FOFs and COLs, on the whole of this record, we cannot conclude that the Circuit Court abused its discretion in concluding that the public's interest and the defendant's interest in fundamental fairness would not be served by conducting a third trial on Counts I, III, and IV.

With respect to Deguair's cross-appeal, the ICA held:

> Assuming, arguendo, that the Circuit Court erred in recalling the discharged jury and belatedly accepting the guilty verdict on Count II (including any errors related to jury polling), presumably the Circuit Court should have allowed the erroneous declaration of a mistrial to stand, notwithstanding the court's error in initially rejecting the verdict. As implicitly acknowledged in Deguair's alternative prayer for relief in this appeal, the appropriate proceeding would then have been a hearing on a motion to dismiss based on Moriwake. However, that is precisely what happened in this case, albeit with the added complications and considerations stemming from the juror misconduct, which were addressed in Deguair's separate motion for relief. Deguair's second motion to dismiss the indictment, which was filed on April 28, 2011, specifically argued that, applying the Moriwake factors to this case, Deguair should not be subjected to a third trial on any of the four remaining counts, with particularized arguments concerning Count II. Deguair does not argue on appeal that the Circuit Court erred in any aspect of its Moriwake analysis.
>
> Instead, Deguair argues that the dismissal of Count II based on the juror misconduct was not based on "manifest necessity," and therefore retrial would be barred by double jeopardy. This argument is

24

> without merit. As Deguair himself argued in his motion to vacate the conviction on Count II and dismiss it with prejudice, which was also filed on April 28, 2011, "the improper instances of jury behavior described above warrant vacating the kidnapping conviction and granting a new trial on the kidnapping count." In essence, Deguair argued that it <u>was</u> a manifest necessity to vacate the conviction on Count II, which the Circuit Court then did. In the Circuit Court proceedings, Deguair further argued in the motion to vacate that, "rather than granting a new trial, Count 2 must be dismissed with prejudice, based on <u>State v. Moriwake</u>, 65 Haw. 47 (1982)," and he incorporated by reference the <u>Moriwake</u> arguments made in his second motion to dismiss indictment, which was filed concurrently therewith. As stated above, Deguair does not argue on appeal that the Circuit Court erred in its <u>Moriwake</u> analysis.

(Emphasis in original).

In other words, the ICA appeared to conclude that there was manifest necessity to declare a mistrial because of the juror misconduct and that Deguair waived his ability to challenge the circuit court's purported analysis of Count II under <u>Moriwake</u>.

The ICA entered a judgment on appeal pursuant to its July 31, 2014 SDO on October 24, 2014.

Both parties timely sought certiorari review.

## II.  Standards of Review

### A.  Motion to dismiss indictment

This court has held:

> A trial court's ruling on a motion to dismiss an indictment is reviewed for an abuse of discretion. The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. The burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it.

<u>State v. Hinton</u>, 120 Hawaiʻi 265, 273, 204 P.3d 484, 492 (2009)

25

(citations, internal quotation marks, and brackets omitted).

**B.   Double jeopardy**

Whether dismissal of a criminal charge is required under double jeopardy is "a question of constitutional law that we review under the right/wrong standard of review."  State v. Toyomura, 80 Hawaiʻi 8, 15, 904 P.2d 893, 900 (1995).

### III.   Discussion

**A.   The State's Application**

On certiorari, the State presents the following question:

> Whether the ICA committed grave errors of law and fact in concluding that Petitioner failed to demonstrate the court abused its discretion in its application of the Moriwake factors and by granting Respondent's motion to dismiss with prejudice the murder and two gun related charges (counts I, III, and IV).

(Internal quotation marks and citation omitted).

We hold that the ICA correctly concluded that the circuit court did not abuse its discretion in its application of the Moriwake factors and by granting Deguair's motion to dismiss Counts I, III, and IV.

**1.   The State's argument that the jury was not genuinely deadlocked fails**

The State argues that the record lacks "undisputed" evidence that the second jury was hung with six jurors voting "guilty" and six jurors voting "not guilty" on Counts I, III, and IV.  The State challenges the circuit court's findings of fact to

26

the extent that they "recite and rely" on the jury's purported six-to-six split.

The State notes that at the April 13, 2011 hearing, the circuit court would not confirm where the jurors stood on all counts when it met with the jurors after the close of trial on April 5, 2011, and therefore, it is "unconfirmed" where the jury stood on Counts I, III, and IV. The State also contends that the court "perhaps improperly, made itself a critical witness" by "meeting privately with the jurors . . . and purportedly receiving the only information regarding the jury's split." The State further notes, "there does not appear to be any evidence in the record that all 12 jurors met with the trial court" and that those who attended the meeting could have been "reluctant" to reveal their verdicts or "confused" because the circuit court instructed the jury, before it began deliberating, as follows:

> You must not discuss this case with any person other
> than your fellow jurors. You must not reveal to the
> Court or to any other person how the jury stands
> numerically or otherwise until you have reached a
> unanimous verdict and it has been received by the
> Court.

Although the State now argues that the six-to-six split was not "undisputed," the State conceded in its response to Deguair's Second Motion to Dismiss in the circuit court that "as to counts 1, 3 and 4, the jury was split evenly at 6/6." In addition, after the jury was discharged, the State could have but did not ask the jurors where they stood on Counts I, III, and

27

IV.[10]  Moreover, the State did not object to the circuit court's plan to speak to the jurors without counsel present.

The State next contends that "the fear and intimidation that weighed constantly on the jurors' minds" further supports a conclusion that the jury was not "genuinely deadlocked."  The State also notes the following:  a statement made by a prospective juror regarding his concerns about being identifiable as a juror; a statement that Deguair "unexpectedly" made at trial that "could have intimidated the jurors"; Juror No. 4's voice mail message to the circuit court regarding a "fear factor for some of the jurors"; Juror No. 4's corroborated statement that Juror No. 1 said "she was not going to get up in open court and say guilty"; and statements made by jurors regarding "the fear of being on a hit list," the "mention of Samoan gangs," and the perceived consequences of being the foreperson.  The State also argued that the multiple instances of juror misconduct undermine

---

[10]    Under the Hawaiʻi Rules of Professional Conduct (HRPC) Rule 3.5(e)(4)(i) (2015), a lawyer may communicate with the jurors after the jury has been dismissed,

> upon leave of the court, which leave shall be freely granted, a lawyer may ask questions of, or respond to questions from, jurors about the trial, provided that the lawyer does so in a manner that is not calculated to harass or embarrass any juror and does not seek to influence the juror's actions in future jury service in any particular case . . . .

Before discharging the jury, the circuit informed both counsel that after the jury was discharged, they could talk to the jurors to ask them where they stood.

the circuit court's conclusion that the jury deliberations and circumstances of the deliberations weigh "only slightly" for allowance of a retrial.

The State's arguments regarding the "fear and intimidation that weighed constantly on the jurors' minds" and the juror misconduct fail because in its opposition in the circuit court to Deguair's Motion to Vacate and Dismiss Count II, the State argued that the statements regarding the Samoan gang affiliation and the juror misconduct were not prejudicial. In other words, the State argued that the jury's fear of retaliation from Samoan gangs and juror misconduct did not prejudice jury deliberations with respect to the kidnapping charge, while now arguing that the fear and misconduct did prejudice jury deliberations with respect to the murder and firearm charges that it now asks this court for the opportunity to retry. See Roxas v. Marcos, 89 Hawaiʻi 91, 124, 969 P.2d 1209, 1242 (1998) ("Pursuant to the doctrine of judicial estoppel, [a] party will not be permitted to maintain inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by his action.") (quoting Rosa v. CWJ Contractors, Ltd., 4 Haw. App. 210, 218, 664 P.2d 745, 751 (1983)). In addition, the State's argument that the jurors were

afraid to return a "guilty" verdict is undercut by the jurors' written guilty verdict as to Count II, kidnapping as a Class A felony, which the foreperson read in open court. Cf. United States v. Watchmaker, 761 F.2d 1459, 1466 (11th Cir. 1985) ("Discussions among the jurors as to their fear of the defendants are not inappropriate, so long as such discussions do not lead them to form an opinion of the defendants' guilt or innocence of the offenses charged.").

In sum, the State's argument that the jury was not "genuinely deadlocked" fails.

## 2. The State's argument regarding possible violations of HRE Rule 606(b) is irrelevant

The State argues that the circuit court's Moriwake analysis "cannot be accepted as correct" because, during the post-trial hearings, the circuit court "ignored the law and both counsels' objections when soliciting repeatedly the jurors' opinions as to whether [Juror No. 1's] experiment had an effect on their deliberations," in violation of HRE Rule 606(b).

However, the State's challenge of these hearings with respect to Counts I, III, and IV is irrelevant. First, there is no indication in the record that the circuit court considered the impact of the duct tape experiment when evaluating Counts I, III, and IV under Moriwake. The circuit court instead conducted its own evaluation of the evidence and concluded that the conflicting

30

evidence as to whether there was duct tape on Duckworth's body when he was murdered was a major weakness in the State's case with respect to Counts I, III, and IV.

Second, the circuit court's inquiries appear to have been conducted to inform the circuit court's analysis of Deguair's Motion to Vacate and Dismiss Count II (concerning juror misconduct with respect to Count II), but not Deguair's Second Motion to Dismiss (concerning the Moriwake factors only regarding Counts I, III, and IV). The State did not challenge the Order re Motion to Vacate and Dismiss Count II on appeal before the ICA or this Court. In other words, the State's argument regarding the juror misconduct revealed during the post-trial hearings appears to be irrelevant to the circuit court's Moriwake analysis with respect to Counts I, III, and IV, and accordingly this argument is irrelevant to the issues in the State's Application.

3. **The circuit court did not abuse its discretion in dismissing Counts I, III, and IV under the Moriwake factors**

In Moriwake, this court addressed whether trial courts have discretionary power sua sponte to dismiss an indictment over the objection of the prosecuting attorney. 65 Haw. at 55, 647 P.2d at 712. The court held, "the judicial power which seeks to administer justice is properly invoked when a trial court sua sponte dismisses an indictment with prejudice following the

31

declaration of one or more mistrials because of genuinely deadlocked juries, even though the defendant's constitutional rights are not yet implicated." Id. (internal quotation marks omitted).

Although the Moriwake Court acknowledged the discretionary nature of trial courts' judicial power to dismiss an indictment and stated it would "accord deference" to the trial court's conclusion, the court determined that "the magnitude of the respective interests of society and of criminal defendants which are implicated in this area of law requires that we more fully delineate the parameters within which this discretion is properly exercised." Id. at 56, 647 P.2d at 712. The court set forth the following test for balancing the interests of the State against fundamental fairness to the defendant:

> The factors which the trial court should consider in undertaking this balance include the following: (1) the severity of the offense charged; (2) the number of prior mistrials and the circumstances of the jury deliberation therein, so far as is known; (3) the character of prior trials in terms of length, complexity and similarity of evidence presented; (4) the likelihood of any substantial difference in a subsequent trial, if allowed; (5) the trial court's own evaluation of relative case strength; and (6) the professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney.

Id. at 56, 647 P.2d at 712-13.

In State v. Hinton, this court explained, "[n]othing in Moriwake indicates that all factors must be given equal weight or that certain factors must be given more weight than others." 120

32

Hawaiʻi at 280, 204 P.3d at 499. In <u>Hinton</u>, this court held that the ICA erred in (1) injecting a "separation of powers" analysis (i.e., assessing when a court might be inappropriately encroaching upon prosecutorial discretion) into the <u>Moriwake</u> framework, and (2) holding that the trial court abused its discretion in dismissing an indictment with prejudice after one mistrial. <u>Id.</u> at 278, 280, 204 P.3d at 497, 499.

In this case, the circuit court, in the Second Dismissal Order, applied the <u>Moriwake</u> balancing test and ultimately granted Deguair's motion to dismiss Counts I, III, and IV. The circuit court concluded:

> Given the State's evidence against the defendant, it is the Court's considered judgment that the chances of the State persuading 12 jurors unanimously to find the defendant guilty beyond a reasonable doubt as charged of Counts I, III and IV are virtually nil. If the Court allowed a third, fourth or fifth retrial, all of the juries would still be hung, and it would be fundamentally unfair to the defendant, and a denial of due process, to continue to put him in jeopardy by subjecting him to another trial on Counts I, III and IV.

Having resolved the State's arguments challenging the circuit court's findings of fact regarding the jury's six-to-six split, <u>supra</u>, we hold that the circuit court did not abuse its discretion in dismissing Counts I, III, and IV under the factors set forth in <u>Moriwake</u>.

### a. The Severity of the Offense Charged

Under the first <u>Moriwake</u> factor, the circuit court

33

found, "[i]t is undisputed that the charges against defendant are extremely serious" (FOF No. 23). The court concluded, "the severity of the charges against [Deguair] argue[s] for allowance of a retrial" (COL No. 3). Because neither party challenged the circuit court's analysis of the first Moriwake factor, we need not address or disturb it here.[11]

### b. The Number of Prior Mistrials and the Circumstances of the Jury Deliberations Therein, So Far as Known

With respect to the second Moriwake factor, the circuit court concluded, "[e]ven though the jury that deliberated in the second trial deliberated only two and a half days, and their deliberations were compromised by some juror misconduct, [the second Moriwake factor] . . . so far as is know[n], argue[s] only slightly for the allowance of a retrial" (COL No. 4).

In Moriwake, this court stated, "[w]ithout suggesting that trial courts are not free, within the bounds of properly exercised discretion, to differ, we proffer that in most cases, serious consideration be given to dismissing an indictment with prejudice after a second hung jury mistrial." 64 Haw. at 57, 647 P.2d at 713. This court has also indicated that the circuit court may consider the numerical breakdown of the hung jury under

---

[11]     This court has suggested that "murder . . . [and] kidnapping" are relatively serious offenses for purposes of the first Moriwake factor. Hinton, 120 Hawaiʻi at 278, 204 P.3d at 497.

the second <u>Moriwake</u> factor.  See <u>Hinton</u>, 120 Haw. at 278-79, 204 P.3d at 497-98 ("The trial court found that this factor weighed in favor of retrial because there had been only one trial and, although the jury indicated that it was eight to four for acquittal at one point, it seemed confused.").

The following factual findings of the circuit court are relevant to the second <u>Moriwake</u> factor:  both trials ended in a mistrial (FOF Nos. 3, 17, 24); jury deliberations lasted seven days in the first trial (FOF No. 3) and two and one-half days in the second trial (FOF Nos. 14, 25); in the first trial, the jurors were evenly split on Counts I through IV, (FOF Nos. 4, 24, 26); in the second trial, the jurors were evenly split on Counts I, III, and IV, (FOF Nos. 18, 24, 26); during the jury deliberations for the second trial, the jury informed the circuit court that it was "deadlocked" on Counts I, III, and IV (FOF No. 14); and the jury deliberations in the second trial were "compromised by some juror misconduct" (FOF No. 25).  In addition, although the circuit court did not make a specific finding in this regard, when asked by the circuit court whether more time would assist the jury in reaching a unanimous verdict on Counts I, III, and IV, the jury responded, "[n]o, the jury has unanimously decided that more time will not help."

Because the two trials for this case ended in a

mistrial when the jurors were evenly split and unable to reach a unanimous decision on Counts I, III, and IV, the circuit court did not "exceed the bounds of reason" in concluding that the second Moriwake factor weighed "only slightly for the allowance of a retrial" (COL No. 4).

### c. The Character of Prior Trials in Terms of Length, Complexity, and Similarity of Evidence Presented

The circuit court concluded that the third Moriwake factor "argue[s] very strongly against a retrial" (COL No. 5).

A comparison between the evidence presented, witnesses testifying, and legal theories argued in each trial are relevant to the third Moriwake factor. See Moriwake, 65 Haw. at 49, 57, 647 P.2d at 708, 713. Relevant considerations can include, for example, the complexity of a trial and whether a case turns on credibility. Hinton, 120 Hawaiʻi at 279, 204 P.3d at 498.

Accordingly, the circuit court's factual findings relevant to this conclusion are as follows: both trials lasted approximately eight days, which was "somewhat long for criminal trials" (FOF Nos. 2, 12, 26); although both trials involved "a lot of witnesses [and] a lot of evidence, . . . at their core, the cases were credibility contests and not complex" (FOF No. 26); and the second trial involved an additional "alleged

eyewitness"[12] to Duckworth's murder, which "did not appear to make a difference because the jury still voted six jurors for not guilty and six jurors for guilty" (FOF No. 26). In addition, at the May 18, 2011 hearing on Deguair's motions, the circuit court stated that "the single most important factor in the court's view is that these were--it's not a complex case . . . . It's credibility at its core."

With respect to the murder and related firearm charges, the issues boil down to whether the jury believed Teo's story, that Deguair shot and killed Duckworth even though no duct tape was found on his body, or Deguair's story, that Teo murdered Duckworth. Given the circuit court's consideration of the similarities between both trials with respect to the legal theories, evidence presented, and witnesses who testified, and its finding that the case was not complex and turned on credibility, the circuit court did not "exceed the bounds of reason" in concluding that the third <u>Moriwake</u> factor "argue[s] very strongly against a retrial" (COL No. 5).

---

[12]     In opposition to Deguair's Second Motion to Dismiss, the State contended that the second trial differed from the first because two additional witnesses--James and Woo--testified for the State in the second trial. Although the circuit court did not make a finding regarding James in the second trial, the State does not challenge the absence of such finding in its Application. Regardless, James's testimony was not highly significant and, similar to Woo's, apparently did not appear to make a difference.

### d.   The Likelihood of Any Substantial Difference in a Subsequent Trial, if Allowed

The circuit court concluded that the fourth Moriwake factor "argues very strongly against a retrial" (COL No. 6).

This court has indicated that whether the evidence submitted in a subsequent trial would be substantially different from prior trials is relevant to this factor.  Hinton, 120 Hawaiʻi at 279, 204 P.3d at 498.

In opposition to Deguair's Second Motion to Dismiss, the State explained its intention to submit fingerprint evidence that was permitted during the first but not the second trial and to again attempt to consolidate Deguair's case with another that supposedly linked Deguair to a 2007 home robbery.  In its Application, the State does not raise any arguments regarding new evidence it might propose to introduce at a subsequent trial.

The circuit court concluded, "[a]dditional evidence that the State proposes to offer in the third trial in the Court's view would not make a difference, and the Court finds no cogent reasons for changing earlier pretrial rulings relating to evidence and [denial of] consolidation of cases, thus the evidence in the third trial would be substantially the same as the second trial" (FOF No. 27), and "[t]here was no substantial likelihood of a substantial difference in the result of a retrial" (FOF No. 28).

38

In sum, the circuit court fully considered the evidence that the State proposed to introduce in a subsequent trial and concluded that the fourth Moriwake factor weighs "very strongly against a retrial."  This conclusion is consistent with the record.

### e.    The Relative Case Strength

The circuit court concluded that the fifth Moriwake factor "argues very strongly against a retrial" (COL No. 7).

Under this factor, the trial court may evaluate the evidence.  See Hinton, 120 Hawai'i at 279-280, 204 P.3d at 498-99.

The circuit court found as follows:

29.  The State had significant problems with the quality of its evidence even though it was able to present the testimony of the two alleged eyewitnesses to the murder who in one sense essentially testified consistent with each other about the circumstances of murder, but directly contradicted each other as to their alleged involvement with the defendant in the murder.  There was also strong evidence of defendant's alleged motive to murder Jermaine Duckworth, and corroborating evidence that the defendant rented the car in another person's name and washed it twice after the murder.

30.  However, the crux of the State's problem with the quality of its evidence was that based on both Teo's and Woo's testimony, Jermaine Duckworth was presumably still taped with duct tape when the defendant allegedly shot Duckworth and pushed him off the cliff at Yokohama Bay, yet there was no tape on Jermaine Duckworth's body, or any other evidence consistent with Teo's and Woo's testimony, explaining why no tape was found on Jermaine Duckworth, or what happened to the duct tape.

At trial, Deguair admitted that he placed duct tape on Duckworth.  Two other witnesses testified that they saw Deguair

39

place duct tape on Duckworth. In addition, Teo and Woo both testified that they saw Deguair and Duckworth walking down the stairs together, and that Duckworth was bound with duct tape. Yet, both Teo and Woo testified that they did not see anyone remove the duct tape from Duckworth, and Teo testified that Duckworth was still bound when he was allegedly shot and murdered. No party disputes that there was no duct tape on Duckworth's body when he was found dead at Yokohama Bay.

Because the circuit court evaluated the State's case and concluded that it was not strong enough to merit another trial when weighed against fundamental fairness to the defendant, the circuit court did not "exceed the bounds of reason" in concluding that this factor weighs heavily against retrial.

### f. The Professional Conduct and Diligence of Respective Counsel, Particularly that of the Prosecuting Attorney

With respect to the sixth Moriwake factor, the circuit court found:

> The State's prosecutor is an excellent prosecutor, one of the best prosecutors in the prosecutor's office, and diligently and professionally presented the State's case to the jury. No other prosecutor from the prosecutor's office would have done better in presenting the State's case to the jury.

(COL No. 31).

The circuit court concluded that the sixth Moriwake factor "argue[s] very strongly against a retrial" (COL No. 8). Because neither party challenged the circuit court's analysis of

the sixth <u>Moriwake</u> factor, we need not address or disturb it here.

In conclusion, the ICA correctly concluded that the circuit court did not abuse its discretion in dismissing with prejudice Counts I, III, and IV under <u>Moriwake</u>.

**B.    Deguair's Application**

Deguair presents the following questions:

1) Did the Intermediate Court of Appeals Gravely Err in Ruling That a Retrial of the Count Two Kidnapping Charge Was Not Barred by Double Jeopardy?

2) Did the Intermediate Court of Appeals Gravely Err in Failing to Address Whether the Trial Court Erred in Recalling the Jury?

We hold that (1) the ICA did not err in concluding that retrial of Count II was not barred by double jeopardy, and (2) the ICA did not err in declining to address whether the circuit court erred in recalling the jury.

**1.    The retrial of Count II was not barred by double jeopardy**

Deguair argues that once the jury was discharged in open court on April 5, 2011, double jeopardy barred the State from subjecting Deguair to a third trial because the trial court erroneously found that there was manifest necessity for a mistrial in Count Two.

The State responds that double jeopardy does not bar retrial. The State adopts the ICA's reasoning that Deguair's double jeopardy argument was without merit because Deguair

41

conceded there was manifest necessity to declare a mistrial on Count II by arguing that the circuit court should vacate Count II because of juror misconduct. The State further argues that Deguair "consented to the trial court's declaration of mistrial on count II" by explicitly agreeing with the circuit court's position on Count II, not objecting when the circuit court reiterated its intention to declare a mistrial, and not objecting after the circuit court declared a mistrial.

Generally, under the double jeopardy clauses of the United States and Hawaiʻi constitutions, "a defendant may not be put in jeopardy twice for the same offense." State v. Wilmer, 97 Hawaiʻi 238, 243, 35 P.3d 755, 760 (2001) (citing U.S. Const. amends. V & XIV; Hawaiʻi Const. art. I, § 10).

This court has "described the purpose underlying the prohibition against double jeopardy" as follows:

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

State v. Quitog, 85 Hawaiʻi 128, 140, 938 P.2d 559, 571 (1997) (quotation marks omitted) (quoting United States v. Scott, 437 U.S. 82, 87-88 (1978)).

This court has also "recognized that there are three

42

separate and distinct aspects to the protections offered by the double jeopardy clause."  Quitog, 85 Hawaiʻi at 141, 938 P.2d at 572 (quoting State v. Ontiveros, 82 Hawaiʻi 446, 450, 923 P.2d 388, 392 (1996)).  Thus, "[d]ouble jeopardy protects individuals against:  (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense."  Quitog, 85 Hawaiʻi at 141, 938 P.2d at 572 (internal quotations marks omitted) (quoting Ontiveros, 82 Hawaiʻi at 450, 923 P.2d at 392).

"However, even when a trial ends without a judgment, a defendant's constitutional right to 'have his trial completed by a particular tribunal' still exists."  Quitog, 85 Hawaiʻi at 141, 938 P.2d at 572 (quoting Arizona v. Washington, 434 U.S. 497, 503 (1977)).

> The reasons why this "valued right" merits constitutional protection are worthy of repetition. Even if the first trial is not completed, a second prosecution may be grossly unfair.  It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent bystander may be convicted.  The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed.  Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.

Quitog, 85 Hawaiʻi at 141, 938 P.2d at 572 (emphases in original) (quoting Washington, 434 U.S. at 503-05).

Nonetheless, "retrial is not automatically barred [by

43

the double jeopardy clause] when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused."  State v. Lam, 75 Haw. 195, 199-200, 857 P.2d 585, 588-89 (1993) (brackets original to Lam, quotation marks omitted) (quoting Washington, 434 U.S. at 505).

> Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial be concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.

Moriwake, 65 Haw. at 52, 647 P.2d at 710 (citing Washington, 434 U.S. at 505).

"Case law requires a balance between the rights of the accused and the public interest.  Both are vitally important to our judicial system, and each must be considered in the context of a trial court's rulings."  Quitog, 85 Hawaiʻi at 142, 938 P.2d at 573 (quoting Lam, 85 Hawaiʻi 128, 75 Haw. at 199-200, 857 P.2d at 588-89).

Accordingly, "[a] mistrial is properly declared and retrial is not barred by the defendant's right against double jeopardy where the defendant consented to the mistrial or there was manifest necessity for the mistrial."  Wilmer, 97 Hawaiʻi at 242-43, 35 P.3d at 759-60.

In essence, the ICA concluded that even though the

circuit court was unaware of the juror misconduct at the time it declared the mistrial on Count II, the subsequent discovery of such misconduct could justify the mistrial on the grounds of manifest necessity.  However, we do not need to rely on that ground because the record establishes that Deguair consented to the mistrial.

For purposes of double jeopardy, consent may be express or implied.  Lam, 75 Haw. at 201-02, 857 P.2d at 589.  This court has held, "[e]xplicit consent arises when a defendant voluntarily moves or argues for a mistrial.  In such a situation, the defendant may be retried."  Id.  In the case at bar, Deguair did not voluntarily move or argue for a mistrial before the circuit court declared a mistrial on Count II on April 5, 2011. Therefore, there was no express consent.

To determine whether a defendant impliedly consented to a mistrial, "[t]he actions of a defendant and the facts of a case must be examined."  Id. at 202, 857 P.2d at 589.  This court has noted:

> [e]xamples of cases where waiver has been found include those where the defendant failed to raise a double jeopardy claim at trial, or in a timely manner; where a defendant pleaded no contest to a criminal charge; where a defendant sought a continuance at trial; where a defendant chose to oppose prosecution's motion to consolidate; and when a defendant sought a new trial after being convicted.

State v. Miyazaki, 64 Haw. 611, 618-19, 645 P.2d 1340, 1346 (1982) (footnotes omitted) (emphasis added).

45

Further, "[t]hese waiver cases underscore the necessity of examining the particular facts of a case in determining whether waiver of a defendant's double jeopardy right has occurred." Id. at 619, 645 P.2d at 1346. Accordingly, "this court will not find waiver of constitutional rights readily but will carefully scrutinize facts of a case to determine if waiver has occurred." Id. at 620, 645 P.2d at 1347.

During jury deliberations in the case at bar, the circuit court, without objection from either party, erroneously informed the jury in response to jury Communication No. 6 that a unanimous response was required for all three interrogatories before it could submit a verdict on Count II. After the jury informed the circuit court that it was unable to reach a unanimous response for the second interrogatory, the circuit court informed the parties that a mistrial would be declared on Count II. Again, neither party objected at that time.

After the jury was called back into the courtroom, and the foreperson delivered what it "believe[d] to be [its] verdict," the circuit court called both counsel to the bench. The circuit court stated that because the jury was unable to reach a unanimous verdict as to Count II, it would not "receive the verdict as to Count II." Although the State contended that a positive response as to only one of the three interrogatories was sufficient, when the circuit court asked for Deguair's position,

46

Deguair explicitly "agree[d] with the court's position" that to accept a verdict on Count II, a unanimous response was required for all three interrogatories. In the presence of the jury, the circuit court declared a mistrial on Count II based on "manifest necessity." Deguair did not object. The circuit court then scheduled the retrial, and Deguair did not object.

Thus, the circuit court informed Deguair of its plan to declare a mistrial because the jurors could not reach a unanimous response for all of the interrogatories, and when asked for his position, Deguair expressly agreed with that plan. Under these circumstances, Deguair consented to the circuit court's declaration of a mistrial.

Deguair cites to two cases to support his argument that retrial on Count II is barred by double jeopardy, State v. Lam, 75 Haw. 195, 857 P.2d 585 (1993), and People v. McGee, 636 N.W.2d 531 (Mich. App. 2001). However, they are distinguishable from the case at bar.

In Lam, the prosecutor, after failing to elicit certain testimony from a witness at trial, spoke to the witness during a recess. 75 Haw. at 197-98, 857 P.2d at 587-88. The trial court stated in a bench conference that it was "forced" to declare a mistrial, and indicated it would announce its ruling after a recess. Id. at 203, 857 P.2d at 590. After the recess, the trial court declared a mistrial, and defense counsel subsequently

47

stated that such a ruling "would be over the objections of the defense[.]"  Id.  Lam was subsequently re-charged, and Lam moved to dismiss the charge based on double jeopardy grounds.  Id. at 119, 857 P.2d at 588.  At a hearing on the motion to dismiss, the motions judge granted the motion and denied the prosecution's motion for reconsideration.  Id.

This court rejected the prosecution's argument that Lam impliedly consented to the mistrial by remaining silent when the trial court "first considered a mistrial[.]"  Id. at 202, 857 P.2d at 590.  This court concluded that "Lam had no duty to object to the mistrial prior to the recess[,]" and explained that "Lam provided the court with an alternative to declaring a mistrial by requesting that [the witness's] testimony be stricken.  In addition, Lam voiced his objection to the court's declaration of a mistrial.  He had no further duty."  Id. at 203, 857 P.2d at 590.

This court also rejected the prosecution's argument that Lam impliedly consented to the mistrial by "call[ing] the prosecution's discussion with [the witness] to the court's attention."  Id. at 204, 857 P.2d at 590.  This court reasoned that Lam "coupled his revelation to the [trial] court with a request to limit [the witness's] testimony[,]" which could "hardly raise the implication of consent."  Id.

Lam is distinguishable from the case at bar because

48

here, Deguair did not offer an alternative course to declaration of a mistrial. Instead, when asked for his position, Deguair expressly agreed with the circuit court's plan.

In McGee, the Michigan Court of Appeals held that the trial court erroneously declared a mistrial on the grounds that an alternate juror was present during jury deliberations. 636 N.W.2d at 540. The court further held that retrial was barred by double jeopardy because the defendant did not "explicitly indicate[] consent to the mistrial, and we will not presume consent in the absence of an affirmative showing." Id. at 537. The defendant "neither objected to nor agreed with the court's conclusion that a mistrial was warranted." Id. However, on appeal, the Michigan Supreme Court held that because "[t]he record in this case reveals circumstances from which consent to the circuit court's declaration of a mistrial can be inferred . . . . [,] retrial is not barred by the constitutional protection against double jeopardy." McGee, 670 N.W.2d at 665. Therefore, the final disposition in McGee provides no support for Deguair's argument that retrial is barred by double jeopardy.

In sum, because Deguair impliedly consented to a mistrial, retrial is not barred by double jeopardy.

## 2.    The ICA did not err in declining to address whether the circuit court erred in recalling the jury

Deguair argues that the ICA should have addressed whether the circuit court erred in recalling the jury.  Deguair contends that because the circuit court did not have authority to recall the jury, the circuit court should have disregarded its error in not accepting a guilty verdict as to Count II and should have instead analyzed Count II under Moriwake as if the jury was deadlocked on Count II.

Deguair's argument that the circuit court should have dismissed Count II under Moriwake as if the jury was deadlocked on Count II fails.  Before the circuit court recalled the jury for purposes of polling the jury, the circuit court realized it had erred in not accepting the guilty verdict on Count II.  The verdict form, which on its face showed that the jury had returned a unanimous verdict of guilty as to Count II and unanimous responses for two of the three interrogatories, confirmed that the circuit court had erred.  Thus, regardless of whether the circuit court had authority to recall the jury for purposes of polling the jury, the circuit court was not required to disregard its error and analyze Deguair's Motion to Vacate and Dismiss Count II as if the jury was actually deadlocked as to Count II. Thus, whether the circuit court had authority to recall the jury for purposes of polling the jury is irrelevant to whether the

circuit court correctly ordered a retrial on Count II based on the juror misconduct.

Further, the circuit court did not err in ordering a retrial on Count II.  This court has held that "[a] fair trial by an impartial jury is guaranteed to the criminally accused by both the sixth amendment of the United States Constitution and article I, § 14 of the Hawaiʻi Constitution.  Inherent in this requirement is that the jury be free from outside influences." State v. Williamson, 72 Haw. 97, 102, 807 P.2d 593, 596 (1991). "The defendant bears the initial burden of making a prima facie showing of a deprivation that 'could substantially prejudice [his or her] right to a fair trial' by an impartial jury."  State v. Chin, 135 Hawaiʻi 437, 443, 353 P.3d 979, 985 (2015) (emphasis and brackets in original) (quoting Williamson, 72 Haw. at 102, 807 P.2d at 596).  "Once the defendant makes a prima facie showing of a deprivation, 'a rebuttable presumption of prejudice is raised.'"  Id. (quoting Williamson, 72 Haw. at 102, 807 P.2d at 596).  "To overcome the presumption of prejudice, the State must prove that the outside influence on the jury was harmless beyond a reasonable doubt."  Id. at 448, 353 P.3d at 990 (citing Williamson, 72 Haw. at 102, 807 P.2d at 596).  In cases involving prejudicial juror misconduct, a retrial is an appropriate remedy. See, e.g., id. at 449, 353 P.3d at 991 (vacating the judgment of conviction and sentence and remanding to the circuit court for a

new trial because the defendant's fundamental right to a fair trial by an impartial jury was compromised); Williamson, 72 Haw. at 104, 807 P.2d at 597 (remanding for a new trial because the juror misconduct at issue was not harmless beyond a reasonable doubt).

In its Order re Motion to Vacate and Dismiss Count II, the circuit court concluded:

> [T]he Court does not conclude as a matter of law that the jury misconduct and the resulting statements that were injected into the deliberations were harmless beyond a reasonable doubt given the totality of the circumstances of the trial and the jury's deliberation.

(COL No. 16)

The circuit court further concluded that Deguair's conviction on Count II should be vacated. Neither party challenged these conclusions in the ICA or this court.

Because it is undisputed that the jury misconduct in the case at bar was not harmless beyond a reasonable doubt, the circuit court correctly ordered a retrial on Count II. Consistent with Hawaiʻi case law, Deguair conceded that a new trial is the appropriate remedy for prejudicial juror misconduct by stating in his Motion to Vacate and Dismiss Count II, "Defendant respectfully submits that even standing alone each of the improper instances of jury behavior described above warrant vacating the kidnapping conviction and granting a new trial on the kidnapping count."

52

In sum, because the circuit court correctly ordered a retrial based on juror misconduct, whether the circuit court had the authority to recall the jury is moot.  Therefore, the ICA did not err in declining to address whether the circuit court erred in recalling the jury.

## IV.  Conclusion

For the foregoing reasons, we affirm the October 24, 2014 judgment of the ICA.

| | |
|---|---|
| Donn Fudo for petitioner-respondent | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Dwight C.H. Lum for respondent-petitioner | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |

