35 P.3d 755

STATE of Hawai'i, Plaintiff–Appellee,

v.

Christopher WILMER, Jr.,
Defendant–Appellant.

No. 22185.

Supreme Court of Hawai'i.

Sept. 19, 2001.

Reconsideration Denied Nov. 30, 2001.

Brian De Lima, of Crudele, De Lima & Shiroma, on the briefs, Hilo, for defendant-appellant.

Brenda Carriera, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., and LEVINSON, NAKAYAMA, and RAMIL, JJ. and Intermediate Court of Appeals Chief Judge BURNS, Assigned by Reason of Vacancy.

Opinion of the Court by NAKAYAMA, J.

Defendant-appellant Christopher Wilmer, Jr. appeals from the trial court's order declaring a mistrial, without prejudice, due to prosecutorial misconduct. Wilmer was on trial for one count of murder in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707-701.5 (1993). In the midst of the trial, the Honorable Riki May Amano, presiding, in response to several instances of prosecutorial misconduct, Wilmer sought to have the case dismissed with prejudice. On appeal, Wilmer argues that the trial court abused its discretion in declaring a mistrial *sua sponte* and, therefore, that retrial is barred by his rights against double jeopardy under the Hawai'i and United States Constitutions. We hold that the trial court erred in concluding that consent and manifest necessity existed and we reverse the trial court's order declaring a mistrial without prejudice.

## I. BACKGROUND

On May 27, 1997, Christopher Wilmer was charged via complaint with one count of murder in the second degree for the death of Gordon Granger. Granger was Wilmer's employer and his supervised release sponsor in another unrelated criminal matter. On May

1, 1997, Granger told an Intake Services Center worker that he would no longer employ Wilmer, thereby placing Wilmer's supervised release in jeopardy. According to the prosecution, by May 13, 1997, Wilmer was aware that his release could be revoked and he would therefore be jailed.

On May 15, 1997, Granger's dead body was found lying in a large pool of blood in his kitchen. At trial, one expert estimated that the time of death had been between 7:30 p.m. on May 14 and 7:30 a.m. on May 15. The police recovered numerous bloody footprints from the kitchen, living room, and bathroom. Twenty footprints matched Wilmer's.

A jury trial began on November 23, 1998. The trial court invoked the witness exclusion rule by an order filed on September 11, 1998. On December 2, 1998, the court noted on the record that it was invoking the exclusion rule and instructed counsel to assist in implementing the rule throughout the duration of the trial.

An Intake Services Center social worker, Sharon Rooney, was scheduled to testify for the prosecution on December 2, 1998 concerning Wilmer's supervised release status. Rooney had been called to testify during her vacation and waited outside the courtroom to be called to the stand. The trial court ruled that, before Rooney could testify, she had to allow defense counsel, Brian De Lima, to review her file on Wilmer so that he could prepare for her cross-examination. After issuing the ruling on the file review, the court took a recess. During the recess, De Lima overheard the deputy prosecuting attorney, Kay Iopa, say to Rooney in a loud voice, "You can thank Brian De Lima" for having to wait at the courthouse all day. De Lima reported the incident to the court and argued that it cast him in a negative light to Rooney and that a juror could have overheard the comment. Iopa denied having spoken in a loud voice but admitted to using the words "You can thank Brian De Lima."

Misty Kuheana, Wilmer's on-and-off girlfriend, testified on December 9, 1998. Ku-

heana was the only witness who testified that Wilmer admitted killing Granger. She testified that, on May 15, 1997, Wilmer told her that he had killed Granger because he thought Granger and Kuheana had been involved in a sexual relationship. He told her that he had stabbed Granger and cut his throat, then washed the knife. Kuheana also testified that, after learning about the bloody footprints found at the scene, Wilmer said that he wanted to put Clorox on his feet to try to remove his footprints.

Prior to Kuheana's testimony, a potential juror who had been excused during jury selection received a letter from the defendant. The potential juror returned to court and showed the letter to the court clerk. In the letter, Wilmer did not mention the pending case, but he indicated that he wanted to pursue a personal relationship with the potential juror.

Counsel for both sides agreed that the letter was not relevant to the case. However, during the lunch recess on December 9, 1998, in the judge's chambers, De Lima asked whether Kuheana had seen the letter. De Lima was considering whether to cross-examine her concerning the letter. Iopa represented that the letter had not been disclosed to Kuheana. Kuheana completed her testimony and, while De Lima questioned Kuheana extensively regarding possible bias, he did not question her regarding the letter Wilmer sent to the potential juror.

During Kuheana's cross-examination, De Lima learned that Lieutenant Francis Rodillas had given her a one thousand dollar Crime Stoppers reward after she cooperated in the investigation and had given statements that incriminated Wilmer. On December 10, 1998, during arguments on the prosecution's motion to recall Lieutenant Rodillas,[1] De Lima informed the court that the payment had never been disclosed to him. Iopa claimed that she had informed Wilmer's former attorney, Stanton Oshiro,[2] about the payment.

1. On December 9, 1998, the prosecution filed a motion to recall Rodillas for the purpose of clarifying testimony he had given on December 7, 1998 during cross-examination. De Lima argued that, before Rodillas was recalled, he

should be required to disclose the circumstances of the reward payment to Kuheana.

2. Oshiro withdrew as Wilmer's counsel in July 1998 and De Lima was named as replacement counsel

De Lima also informed the court that he had discovered that someone from the prosecutor's office had shown Kuheana the letter to the juror during a recess during her testimony. Iopa admitted that Victim Witness Counselor Irene Bender had told Kuheana about the letter, but represented that it had not been until after Kuheana's testimony had been completed. After the court took a brief recess to give Iopa the opportunity to speak with Bender again, Iopa returned and repeated that Kuheana had not learned about the letter until after she had testified. After a hearing,[3] the trial court found that Bender had told Kuheana about the letter during the lunch recess, in the middle of Kuheana's testimony. The court also found that Bender informed Iopa during that same lunch recess that she had told Kuheana about the letter.

On December 11, 1998, De Lima filed a motion to dismiss with prejudice and/or to strike Kuheana's testimony and/or for an instruction regarding prosecutorial misconduct and/or to compel discovery (motion to dismiss). The motion was premised on the prosecution's failure to disclose the reward payment to Kuheana. A hearing on the motion was held on December 14, 1998.

At the hearing, De Lima made an offer of proof and asked for permission to call Iopa as a witness and question her about other discovery matters. De Lima represented to the trial court that he had recently interviewed Warren Mehau, a friend of Wilmer's, in preparation for trial. Mehau informed De Lima that someone from the prosecutor's office had taken his statement in August 1998. De Lima informed the trial court that the statement was exculpatory and he had not received a copy of any report containing exculpatory statements by Mehau. After a short recess, Ian Cate, Iopa's co-counsel, informed the court that the report had not been provided to the defense.

Later that morning, after the jury was excused, the trial court held an HRE Rule 104 hearing on the Kuheana reward and the Mehau report. Iopa testified that she did not provide a copy of the report to the defense because it was consistent with information that the defense already had. Iopa also testified that she had discussed the report with her trial team, which included Howard Sur, the investigator who prepared the report. Iopa testified that the team decided that Mehau should not be called as a prosecution witness. Because Mehau was to be called by the defense as an alibi witness, Iopa stated that she believed that she was not obligated to disclose the report because it was a statement of a defense witness. Iopa conceded that she had received a letter from De Lima requesting disclosure of all alibi evidence and that she did not directly respond to the request.

Howard Sur testified that he interviewed Mehau on August 20, 1998 and prepared a report on the same date. The report detailed the interview and provided dates and times of Mehau's contacts with Wilmer around the estimated time of Granger's death. Sur testified that he did not remember discussing the report's disclosure with Iopa and that he believed that it would be turned over to the defense as a matter of practice.

Iopa was also questioned about the reward payment to Kuheana. Iopa claimed that she disclosed it to Oshiro and the court during a conference in the judge's chambers. Oshiro then testified that Iopa mentioned a one thousand dollar check was being held in a safe for Kuheana pending Rodillas' application for the payment. Oshiro said that the discussion occurred at the prosecutor's office, not in the judge's chambers, on or around June 27, 1997. He said that he was never informed that the money was actually given to Kuheana. The trial court found that Lieutenant Rodillas made the reward payment to Kuheana sometime in July or August 1997 and that Iopa knew about the payment at that time. The court also found that De Lima had never been told about the reward.

3. The trial court allowed De Lima the opportunity to examine Bender in a hearing pursuant to Hawai'i Rules of Evidence (HRE) Rule 104 (1998). Rule 104(c) states: "Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if the accused so requests."

On December 15, 1998, after hearing further arguments on the motion to dismiss, the trial court *sua sponte* declared a mistrial without prejudice.[4] Prior to this point, the prosecution had completed its case-in-chief.

On December 31, 1998, the trial court issued its amended findings of fact, conclusions of law, and order declaring a mistrial without prejudice.[5] The court, in pertinent part, found that: (1) Iopa attempted to cast De Lima in a negative light to Rooney; (2) Iopa made two misrepresentations to the court about when Kuheana had seen the letter to the potential juror; (3) Iopa's testimony about the Mehau report was directly contradicted by Sur's testimony; and (4) Iopa's testimony about the reward payment was directly contradicted by Oshiro's testimony. The court, in pertinent part, concluded that: (1) the Mehau report was material information tending to exculpate the defendant; (2) the reward payment to Kuheana was direct evidence as to her interests or motives; (3) Iopa and Bender violated the witness exclusion rule by discussing the letter with Kuheana; and (4) Iopa's misrepresentations about the disclosure of the letter and her remarks to Rooney constituted misconduct.

Finally, "[t]he court conclude[d] that the prosecutor's transgressions constitutes [sic] manifest necessity warranting mistrial." The trial court considered the following possible methods of dealing with the defense's concerns: "recalling witnesses, allowing witnesses to be added to the defense list, giving curative instructions, ordering that the testimony of Misty Kuheana be stricken, and affording counsels additional time for opening statements." The trial court concluded that none of these, alone or in combination, would effectively cure the problems that had arisen. Noting that some of the factors in deciding whether a mistrial was to be with or without prejudice included the: "seriousness of the offense, facts and circumstances leading to dismissal, [and] impact of reprosecution on the administration of the courts and justice," the trial court ordered that mistrial be without prejudice. The court also concluded that the retrial would not violate Wilmer's right against double jeopardy because Iopa had not acted intending to avoid acquittal or to deny Wilmer's right to a fair trial and because, by filing the motion to dismiss, Wilmer had consented to the mistrial.

Wilmer timely appealed the trial court's order. On appeal, he argues that the trial court erred in granting a mistrial without prejudice and that a retrial would violate his right against double jeopardy. The prosecution concedes that Iopa committed misconduct. The answering brief states that "[t]he misconduct regarding Mehau was curable because the trial court could have granted a continuance to De Lima and could have allowed De Lima to add Sur to the witness list. However the misconduct regarding Kuheana is a different matter." Instead, the prosecution argues that the trial court correctly found that there was manifest necessity for a mistrial, that Wilmer consented to the mistrial, and that the misconduct was not intended to avoid an acquittal and did not deny Wilmer a fair trial.[6] We agree with Wilmer that retrial is barred.

## II. DISCUSSION

### A. Standard of review

■ A mistrial is properly declared and retrial is not barred by the defendant's right against double jeopardy where the defendant

---

4. The trial court stated, "The Court is dismissing this matter—rather declaring a mistrial. It is without prejudice.... I believe that it is appropriate that I dismiss this case without prejudice." In context, it is clear that the court declared a mistrial. This was confirmed by the order that was subsequently entered.

5. The trial court's original order was filed on December 22, 1998. The amended order was filed because the original order did not address the issue of whether the retrial would violate double jeopardy.

6. The prosecution relied upon *State v. Pulawa*, 58 Haw. 377, 382, 569 P.2d 900, 905 (1977), in which this court held that retrial is barred where "the defendant's mistrial motion is the necessary response to judicial or prosecutorial misconduct designed to avoid an acquittal, or is necessitated by deliberate misconduct which has for its intended purpose the denial of the defendant's constitutional right to a fair trial[.]" However, during the pendency of this appeal, this court overruled *Pulawa* in *State v. Rogan*, 91 Hawai'i 405, 423 n. 10, 984 P.2d 1231, 1249 n. 10 (1999).

consented to the mistrial or there was manifest necessity for the mistrial. *State v. Quitog*, 85 Hawai'i 128, 142, 938 P.2d 559, 573 (1997); HRS § 701–110(4) (1993).

When prosecutorial misconduct is the basis for a motion for mistrial, a new trial is warranted only where "the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. Kupihea*, 80 Hawai'i 307, 316, 909 P.2d 1122, 1131 (1996) (quoting *State v. McGriff*, 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994)). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the reviewing court] consider[s] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against [the] defendant." *Id.* (quoting *State v. Agrabante*, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992)).

*State v. Loa*, 83 Hawai'i 335, 348–49, 926 P.2d 1258, 1271–72 (1996) (alterations in original). A trial court's declaration of a mistrial is reviewed under the abuse of discretion standard. *Quitog*, 85 Hawai'i at 142, 938 P.2d at 573. A determination of manifest necessity is likewise left to the sound discretion of the trial court. " 'An abuse of discretion occurs when the decisionmaker exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.' " *State v. Vliet*, 95 Hawai'i 94, 108, 19 P.3d 42, 56 (2001) (quoting *In re Water Use Permit Applications*, 94 Hawai'i 97, 183, 9 P.3d 409, 495 (2000)) (citation and internal quotation marks omitted).

7.  HRS § 701–110 states in pertinent part:

    When a prosecution is for an offense under the same statutory provision and is based on the same facts as a former prosecution, it is barred by the former prosecution under any of the following circumstances:
    . . . .
    (4) The former prosecution was improperly terminated. Except as provided in this subsection, there is an improper termination of a prosecution if the termination is for reasons not amounting to an acquittal, and it takes place after the first witness is sworn but before verdict. Termination under any of the following circumstances is not improper:
    (a) The defendant consents to the termination or waives, by motion to dismiss or oth-

## B. Retrial is barred by Wilmer's right against double jeopardy.

■ A defendant has a "valued right" to "have his [or her] trial completed by a particular tribunal." *Quitog*, 85 Hawai'i at 142, 938 P.2d at 573 (quoting *Arizona v. Washington*, 434 U.S. 497, 503, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978)). Generally, a defendant may not be put in jeopardy twice for the same offense. U.S. Const. amends. V & XIV; Hawai'i Const. art. I, § 10. Further bars to reprosecution are contained in HRS § 701–110 (1993).[7] "Thus, an analysis of a defendant's double jeopardy claim must usually consist of constitutional as well as statutory analysis." *State v. Miyazaki*, 64 Haw. 611, 617, 645 P.2d 1340, 1345 (1982).

■ As noted *supra*, retrial is not barred where the defendant consented to a mistrial or there was manifest necessity for the mistrial. However, when the mistrial is prompted by prosecutorial misconduct, even where the defendant consented to the mistrial, the consent can be negated by the egregiousness of the prosecutor's misconduct. In *State v. Rogan*, this court held that "reprosecution after a mistrial or reversal on appeal as a result of prosecutorial misconduct is barred where the prosecutorial misconduct is so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a fair trial." 91 Hawai'i 405, 423, 984 P.2d 1231, 1249 (1999).

### 1. Consent

■ A defendant can consent to a mistrial expressly, such as through a motion for a erwise, the defendant's right to object to the termination.
    (b) The trial court finds the termination is necessary because:
    (i) It is physically impossible to proceed with the trial in conformity with law; or
    (ii) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law; or
    (iii) Prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the State; or
    (iv) The jury is unable to agree on a verdict; or
    (v) False statements of a juror on voir dire prevent a fair trial.

mistrial, or impliedly. *Quitog,* 85 Hawai'i at 142, 938 P.2d at 573. In the present case, Wilmer moved for a dismissal with prejudice. The trial court concluded that this constituted consent to the mistrial.

■ Wilmer made it clear, however, that he did not contemplate further proceedings if dismissal were granted. During the hearing on the motion to dismiss, De Lima further made it clear that the defense was not seeking a mistrial. He specifically stated, "We're asking for dismissal with prejudice," and later acknowledged that if the defense moved for a mistrial, Wilmer could be retried. Wilmer's motion and defense counsel's arguments clearly indicate that Wilmer did not consent to a mistrial.

The United States Supreme Court has stated:

> Even when judicial or prosecutorial error prejudices a defendant's prospects of securing an acquittal, he may nonetheless desire "to go to the first jury and, perhaps, end the dispute then and there with an acquittal." *United States v. Jorn,* [400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) ]. Our prior decisions recognize the defendant's right to pursue this course in the absence of circumstances of manifest necessity requiring a sua sponte judicial declaration of mistrial....
>
> ... In such circumstances, the defendant generally does face a "Hobson's choice" between giving up his first jury and continuing a trial tainted by prejudicial judicial or prosecutorial error. *The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error.*

*United States v. Dinitz,* 424 U.S. 600, 608–09, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (emphasis added).[8] Thus, by refusing to consent to a mistrial, Wilmer effectively chose to accept any prejudice caused by the prosecutor's misconduct and continue with the trial. Because we hold that Wilmer did not consent to the mistrial under the constitutional double jeopardy analysis, we do not reach the question whether he consented under HRS § 701–110(4)(a) (1993). Further, because Wilmer did not consent to the mistrial, we do not reach the *Rogan* analysis here. Absent circumstances constituting manifest necessity, the trial court should have honored Wilmer's decision to proceed with the trial.

### 2. Manifest necessity

■ "Manifest necessity is defined as ... circumstances in which it becomes no longer possible to conduct the trial or to reach a fair result based upon the evidence." *Quitog,* 85 Hawai'i at 143, 938 P.2d at 574 (quoting *Lam,* 75 Haw. at 204–05, 857 P.2d at 590) (alterations omitted). We note that in *Lam* we defined manifest necessity as a " 'sudden and overwhelming emergency beyond control of court and unforeseeable.... [W]here, due to circumstances beyond control of parties and court, it becomes no longer possible to conduct trial or to reach a fair result based upon the evidence.' " 75 Haw. at 204–05, 857 P.2d at 590 (quoting *Black's Law Dictionary* 963 (6th ed.1990)) (alterations in original). However, the requirement that the circumstances be beyond the control of the parties is inconsistent with our double jeopardy case law. The requirement was adopted, but not relied upon, in *Lam* and has not appeared in any subsequent double jeopardy cases. The requirement also improperly implies that there are categorical rules concerning what can and cannot form the basis of manifest necessity. For example, prosecutorial misconduct is arguably always within the prosecutor's control and can, therefore, never constitute manifest necessity. This court has recognized that "[i]t is impossible to define all the

8. The United States Supreme Court subsequently clarified portions of *Jorn* and *Dinitz,* holding that "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Oregon v. Kennedy,* 456 U.S. 667, 676, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). The Court noted that portions of *Jorn* and *Dinitz* implied a broader rule that double jeopardy would bar retrial if the defendant's consent was prompted by prosecutorial overreaching. However, the court in *Kennedy* reaffirmed the general proposition, stated in *Dinitz,* that, absent manifest necessity, a defendant should retain primary control over the course of his trial after prosecutorial misconduct has occurred. *Id.*

circumstances [that] would render it proper to interfere by declaring a mistrial." *Quitog*, 85 Hawai'i at 133, 938 P.2d at 574 (citation omitted). Further, "[t]he United States Supreme Court has noted that there is no 'standard that can be applied mechanically or without attention to the particular problem confronting the trial judge.'" *Lam*, 75 Haw. at 205, 857 P.2d at 591 (quoting *Arizona v. Washington*, 434 U.S. 497, 506, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978)). Therefore, insofar as *Lam* requires that the circumstances constituting manifest necessity must be beyond the control of the parties, and that it be a sudden and overwhelming emergency, it is overruled.

■ "Because manifest necessity is a high standard not to be declared lightly, a trial judge should record his or her reasons for declaring a mistrial and include the reasons for finding manifest necessity." *Id.* (citations omitted). However, where the trial court has found manifest necessity based on prosecutorial misconduct, retrial will be prohibited "where the prosecutorial misconduct is so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a fair trial." *Rogan*, 91 Hawai'i at 423, 984 P.2d at 1249.

■ In the order declaring a mistrial without prejudice, the trial court entered the following conclusions of law: 1) Iopa violated Hawai'i Rules of Penal Procedure Rule 16(b)(1)(vii) (1998) by failing to disclose the Mehau report and the reward payment to Kuheana; 2) Iopa and Bender violated the witness exclusion rule by telling Kuheana about the letter to the potential juror; and 3) Iopa committed misconduct by making misrepresentations to the court regarding the letter and by casting De Lima in a negative light to Rooney. The prosecution does not contest these conclusions.

Although Iopa's many instances of misconduct in this case were inexcusable, they resulted in little actual prejudice to Wilmer. What little prejudice that did result could have been cured through means other than a mistrial. Therefore, it was not impossible for the court to proceed with the trial and reach a fair result on the merits.

Iopa's failure to disclose the Mehau report resulted in minimal prejudice to Wilmer's defense. De Lima's files included a letter dated June 5, 1998 to Iopa from Oshiro, which notified the prosecution of Wilmer's intent to rely on an alibi defense. Mehau was listed as an intended alibi witness. The letter recounted the information Oshiro had about Wilmer's whereabouts on May 14 and 15, 1997. It stated that Wilmer went to Mehau's apartment on May 14, left briefly to go to Granger's residence, and discovered the body.

The Sur report was, for the most part, consistent with the information contained in Oshiro's letter, but the report provided some additional details. According to Sur's report, when Wilmer first arrived at Mehau's apartment, it was between 11:00 a.m. and 2:00 p.m. Mehau said that Wilmer returned less than ten minutes later and did not have any blood on him. Mehau also told Sur about the following conversation he had with Wilmer when Wilmer returned:

Defendant: Uncle Brah, if I tell you I saw one dead body, you would tell?

Mehau: Why, you went kill somebody?

Defendant: No, I nevah.

Mehau: Why don't you call the cops?

Defendant: (Said nothing)

Mehau said that he did not take Wilmer seriously because he thought of Wilmer as a "good liar." However, when he heard about Granger's death, he thought Wilmer must have been telling the truth. Because the report was, for the most part, consistent with information already known to the defense, Iopa's failure to disclose the Mehau report resulted in little actual prejudice to Wilmer. A brief continuance would have been sufficient to allow Wilmer to evaluate the additional information provided in the report and incorporate it into the defense case.

Further, even though De Lima was not aware of the one thousand dollar reward payment, he elicited testimony from Kuheana that Officer Rodillas paid her the one thousand dollar reward and paid for her to stay in the Naniloa Hotel "for [her] protection." This was sufficient to allow De Lima to attack her credibility by arguing that she was

biased in favor of the prosecution. Wilmer's defense was not significantly prejudiced because his attorney did not learn about the payment until trial was in progress.

■ Iopa and Bender violated the witness exclusion rule by disclosing Wilmer's letter to the former juror to Kuheana.[9] However, Wilmer does not allege, nor is there any indication in the record, that Kuheana changed her testimony as a result of learning about the letter. Her testimony after she learned about the letter was consistent with the testimony she gave prior to that point. Had the trial proceeded, any prejudice to Wilmer could have been cured by allowing De Lima the opportunity to further cross-examine Kuheana in order to question her about the letter. In addition, Iopa made repeated misrepresentations to the court about the disclosure of the letter. Although they clearly constituted misconduct, the misrepresentations themselves did not prejudice Wilmer's right to a fair trial except insofar as Iopa could have been more forthright about the circumstances of how Kuheana learned about the letter to the potential juror.

Finally, Wilmer was not prejudiced by Iopa's attempt to cast De Lima in a negative light by telling Rooney that De Lima was responsible for making Rooney wait. Wilmer does not argue that Iopa's comment affected Rooney's testimony, nor did he establish that any of the jurors overheard the remark.

Iopa's misconduct resulted in minimal prejudice to Wilmer, and the prejudice that did result could have been cured through means other than a mistrial. At the point that the trial court declared the mistrial, it was possible for the trial to proceed and for the court to reach a fair result based on the evidence.

■ We hold that the trial court abused its discretion in concluding that there was manifest necessity for the mistrial because the circumstances creating an apparent need for a mistrial did not make it impossible for the trial to proceed. Because we hold that manifest necessity did not exist under the constitutional analysis, we do not reach the analysis under HRS § 710–110, nor do we reach the *Rogan* analysis. In the absence of manifest necessity, Wilmer should have been allowed to choose between continuing with the trial or consenting to a mistrial.[10] Because Wilmer did not consent to a mistrial, retrial is barred by Wilmer's double jeopardy rights. Therefore, the trial court erred in concluding that the mistrial would be without prejudice.

## III. CONCLUSION

For the foregoing reasons, we reverse the trial court's order.

9. HRE Rule 615, which is identical to Rule 615 of the Federal Rules Evidence, addresses only the exclusion of witnesses from the courtroom. However, the ICA has noted that "the federal courts have not countenanced the circumvention of the rule." *State v. Elmaleh*, 7 Haw.App. 488, 492, 782 P.2d 886, 889 (1989) (citing *United States v. Jimenez*, 780 F.2d 975 (11th Cir.1986) (before testifying a government witness read the testimony of another witness from a prior mistrial); *United States v. Blasco*, 702 F.2d 1315 (11th Cir.1983) (during an overnight recess, the prosecuting attorney met with two witnesses who were subject to the sequestration order)) (some citations omitted). "Counsels know, and are responsible to the court, not to cause any indirect violation of the Rule by themselves discussing what occurred in the courtroom with the witnesses." *Id.* at 493, 782 P.2d at 889. The prosecution caused an indirect violation of the witness exclusion rule when a member of the prosecu-

tor's office told Kuheana about the letter to the former juror.

10. It is clear that the prosecutor committed misconduct in this case. The prosecutor's misconduct did have some effect on Wilmer's rights. However, the misconduct did not rise to the level of manifest necessity because it could have been effectively cured. In such circumstances, the ultimate decision whether to proceed or accept a mistrial should be left to the defendant. The defendant should be able to choose between enduring the burdens of another trial in order to avoid the effects of the prosecutor's misconduct and proceeding in spite of the misconduct, with all possible curative measures, in order to obtain a quicker resolution of the case. In the alternative, the prosecution may consent to a mistrial with prejudice.