**Electronically Filed
Intermediate Court of Appeals
CAAP-24-0000562
19-JUN-2026
07:56 AM
Dkt. 120 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---oOo---

STATE OF HAWAIʻI, Plaintiff-Appellee, v.
KADEN K. KANAE, Defendant-Appellant

NO. CAAP-24-0000562

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CPC-18-0001569)

June 19, 2026

LEONARD, PRESIDING JUDGE, HIRAOKA AND MCCULLEN, JJ.

OPINION OF THE COURT BY HIRAOKA, J.

This criminal appeal concerns a trial court's determination that there was manifest necessity to declare a hung-jury mistrial, and its denial of the defendant's motion to dismiss the indictment based on double jeopardy and State v. Moriwake, 65 Haw. 47, 647 P.2d 705 (1982).

Kaden K. **Kanae** was tried for murder in the second degree and related offenses in connection with the September 29, 2018 early-morning shooting of **Thomas** McCandless, Jr. at

Monuments, a landmark in Haleʻiwa. A jury was empaneled on February 16, 2024. Evidence was presented over seven days. The jury began deliberating at 12:28 p.m. on March 4, 2024.

By the end of the next day, the jury had sent four communications. The fourth stated they were deadlocked. The trial court responded: "Will additional time to deliberate assist you in reaching a unanimous verdict?"

The jury answered: "No, more time will not aid the process."

After conferring with the deputy prosecuting attorney and defense counsel, with Kanae present, the court declared a mistrial based on manifest necessity.

On June 29, 2024, Kanae moved to dismiss the indictment based on double jeopardy. The trial court entered findings of fact, conclusions of law, and an order denying the motion.[1] Kanae appeals.

We have jurisdiction under the collateral order exception to the final-judgment rule. State v. Minn, 79 Hawaiʻi 461, 464, 903 P.2d 1282, 1285 (1995). We hold: (1) the trial court acted within its broad discretion when it decided that manifest necessity justified a discharge of the jury and no less severe options were available under the circumstances of this case; and (2) the trial court acted within its discretion when it denied Kanae's motion to dismiss the indictment. We affirm the order denying Kanae's motion to dismiss.

---

[1] The Honorable Shanlyn A.S. Park presided.

## I. POINTS OF ERROR

Kanae states fifteen points of error and makes three arguments: (1) there was no "manifest necessity" to declare a hung-jury mistrial; (2) he did not consent to a mistrial declaration; and (3) the trial court abused its discretion by failing to dismiss the indictment under Moriwake. He challenges several of the trial court's findings of fact and conclusions of law, some of which are actually mixed findings and conclusions.

## II. STANDARDS OF REVIEW

Trial judges have "broad discretion" to decide "whether or not 'manifest necessity' justifies a discharge of the jury." Moriwake, 65 Haw. at 52, 647 P.2d at 710. This is because not discharging a jury that is unable to reach a unanimous verdict creates "a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." Id. at 52-53, 647 P.2d at 710. In other words, a compromise verdict. See State v. Fajardo, 67 Haw. 593, 699 P.2d 20 (1985) (defendant charged with murder was convicted of included offense of manslaughter shortly after deadlocked jury was given an Allen instruction).

A trial court's application of Moriwake to a motion to dismiss an indictment is also reviewed for abuse of discretion. State v. Deedy, 141 Hawaiʻi 208, 214, 407 P.3d 164, 170 (2017).

Findings of fact are reviewed under the *clearly erroneous* standard. Cowan v. Exclusive Resorts PBL1, LLC, 156 Hawaiʻi 268, 272, 574 P.3d 288, 292 (2025). Conclusions of law

3

are reviewed de novo under the *right/wrong* standard. Id. A determination presenting mixed questions of fact and law is reviewed under the *clearly erroneous* standard because it implicates the facts and circumstances of the case. Id.

### III. DISCUSSION

**A. The trial court acted within its discretion when it declared a hung-jury mistrial.**

"A mistrial from a hung jury is a safeguard built into the American system of jurisprudence." Fajardo, 67 Haw. at 600, 699 P.2d at 24. "A conscientious minority [of jurors] is the backbone of our American way of life. No individual, group or institution, however altruistic its intentions, can set aside the sincere convictions of a minority to conform to that of the majority for the expedience of rendering a unanimous decision." Id. at 601, 699 P.2d at 25. Thus, a mistrial is properly declared where there is *manifest necessity*. State v. Wilmer, 97 Hawaiʻi 238, 242-43, 35 P.3d 755, 759-60 (2001). "Manifest necessity" exists when "it becomes no longer possible to conduct the trial or to reach a fair result based upon the evidence." Id. at 244, 35 P.3d at 761.

Here, the first three jury communications came at 9:45 a.m. on the second day of deliberations. The first asked:

> Can we have a copy of the ballistics report.
> By: Curtis Kubo
> Does the bullet found at marker #5 match the revolver?

The court responded at 10:18 a.m.:

You have received all of the evidence you may consider to decide the case. The court will not provide a copy of Curtis Kubo's report.

The second communication asked:

Can we have Shayden McCandless' testimony?

The third asked:

Can we have a replay of Dr. Happy's testimony?
Did Dr. Happy state that the angle that McCandless was shot, was from a reclined, laying down, position?

The court responded to the second and third communications, again at 10:18 a.m.:

Please refer to your individual and collective memory as to Shayden McCandless and Dr. Happy's testimony. The transcripts of their testimony are not available and the testimony cannot be played back.

Kanae does not contest the propriety of the court's responses to the first three communications.

The fourth communication came at 3:55 p.m.:

What happens if the vote cannot be unanimous? hung jury

The court responded at 4:08 p.m.:

Will additional time to deliberate assist you in reaching a unanimous verdict?

The jury responded:

No, more time will not aid the process.

The court conferred with counsel, with Kanae present:

Based upon [the jury's last response], the court's inclination is to declare a mistrial at this time as this

5

jury is unable to reach a unanimous verdict despite one-and-a-half days of deliberation.

Mr. Bell, the State's position?

MR. BELL: Well, I'll just ask the court to explicit[ly] say manifest necessity exists for the pronouncement of a mistrial.

THE COURT: Yes.

Mr. Merrill?

MR. MERRILL: Mr. Kanae agrees with the court's position.

THE COURT: All right.

All right. Based upon that, the court does find that the standard of manifest necessity has been met as this jury has deliberated for one-and-a-half days and has sent four communications. Based upon that, the court will declare a mistrial at this time.

The jury was brought into the courtroom. The foreperson confirmed they could not reach a unanimous decision even if given more time. The court thanked the jury and excused them.

There was conflicting evidence about who shot Thomas, and what weapon had been used. The jury communications, considered in light of the evidence presented, could explain why the jury was deadlocked.

### **The Perpetrator**

Thomas's son, **Shayden** — who was thirteen when his father was shot and nineteen when he testified at trial — was the only witness who saw Thomas being shot. He wasn't able to identify Kanae in a field show-up, but he identified Kanae at trial. He testified he was in the back seat of his family's van when his father stopped it at Monuments. Kanae was there. Thomas got out and confronted Kanae. Thomas shoved Kanae in the

chest.  Kanae "threw a left hook to my dad's right jaw."  Two other people he didn't know also started to punch Thomas.  One of them punched the back of Thomas's head, which made him stumble to the ground.  He ended up on his back.

Shayden got out of the van.  He saw tattoo marks along Kanae's neck and "some markings right along the eye bag" on the right side of Kanae's face.  His father was still on the ground.  He saw Kanae pull a black gun out of his waistband.  Kanae "extended his arm and then angled it down towards my father."  "Then he proceeded to pull the trigger."  Shayden heard the gunshot.  "Since I didn't see any shells fly out, I assumed that it was a revolver."  Kanae and the other two men got into a silver Acura and drove toward Haleʻiwa town.  Shayden called 911, and then his mom.

The first police officer to arrive at the scene found Thomas lying on his back.

Kanae didn't testify, but offered a recorded interview between two Honolulu Police Department (**HPD**) investigators and Alexander **Kinney**.  A video of the hour-and-forty-minute interview was admitted without objection and played for the jury.  Kinney has several tattoos on his face, including his son's name, Julian, above his right eyebrow, the number 13 under his right eye, and the number 85 under his left eye.

Kinney described being at Monuments with Kanae.  A van pulled up fast.  A guy jumped out and approached Kanae.  They started fighting.  Kinney jumped in.  The guy got beat up and was on the ground.  "[H]e got up on all fours."  Then he got up fast

and grabbed Kinney. Kinney had a black revolver with a black rubber grip. He took the gun from his belt. He pulled away from the guy and the gun fired. The guy was "at the same level" as Kinney. Kinney fired once, and the guy "falls down," "just drops slowly." Kanae was standing in the middle of the road, "not close." Kinney threw the gun away "somewhere far." Kanae ran to Kinney's silver Acura and Kinney drove toward Haleʻiwa. No one else was in the car.

Christopher **Happy**, M.D. performed Thomas's autopsy. Thomas had a single gunshot wound in his mid-chest. The size of the entry wound was consistent with a .38 caliber bullet shot at close range, "which is usually up to 6 to 10 inches." The exit wound was on the back of the upper right shoulder. The jury was shown photographs of Thomas's body with rods showing the bullet's trajectory. It went from front to back, with an eight-inch upward climb. Dr. Happy opined that was consistent with Thomas lying on his back when he was shot; if Thomas and the person who shot him were both standing facing each other, the wound track would be level unless the shooter was holding the gun low and at an angle that "is quite acute."

Dr. Happy also testified he found abrasions on Thomas's knee and left forearm that were consistent with someone scraping their knee and elbow while trying to stand up from an asphalt road. He also found sand on the front and back of Thomas's shirt, consistent with Thomas being on his belly and on his back at some point in time.

### The Weapon

Shayden testified the gun he saw was black.  Kinney said the gun he used was a black revolver with a black rubber grip, and he threw it "somewhere far."

Justin **Raymond** was the shop foreman at 4 Wheel Parts. **Shane** Nahoʻoikaika-Ramirez and someone named Kaden also worked at 4 Wheel Parts.  Raymond's description of Kaden — "tall, skinny, had some tats on him, short hair" — matched Kanae's appearance. In the mid-morning on September 29, 2018 (Thomas was shot in the early morning that day), Shane gave Raymond a gun.  Raymond called HPD officer Desi **Miner**, whom he had known for over ten years, that afternoon.  Asked why he called Officer Miner, he replied:  "Because we were going to turn it in."

The jury heard a recording of a February 27, 2020 phone call between Kanae and a woman, made while Kanae was in custody. A male voice is heard saying:  "Tell her to text Keoni to talk to Shane to testifying against -- to --  to not testify against me. Okay.  Thank you."

Officer Miner testified that Raymond is his long-time friend.  Raymond called him at about 4:20 p.m. on September 29, 2018.  He met Raymond later that evening.  Raymond gave him a sock with a gun and ammunition inside.  The gun was a silver revolver with a brown wooden handle.  Officer Miner turned the items over to the lead homicide detective on Thomas's case.

Curtis **Kubo** was a criminalist with HPD.  He examined the items in the sock Raymond gave to Officer Miner.  The gun was

a Taurus .38 caliber revolver with a silver finish and checkered wooden grip.  He also examined State's Exhibit 191, a spent bullet that had been found behind the driver's side rear tire of Thomas's van and marked with evidence marker #5.  Kubo determined the bullet had been fired from the Taurus revolver.

### Manifest Necessity

A trial court's decision to declare a mistrial when it considers the jury deadlocked is "accorded great deference by a reviewing court."  Arizona v. Washington, 434 U.S. 497, 510, 98 S. Ct. 824, 832, 54 L. Ed. 2d 717 (1978).  "[T]he rationale for this deference in the 'hung' jury situation is that the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate."  Id. at 510 n.28, 98 S. Ct. at 832 n.28, 54 L. Ed. 2d 717 n.28.

Here, the trial court saw "firsthand and independently appraised the evidence and the credibility of the witnesses; and . . . closely observed the jury and the manner in which the jury deliberated."  Deedy, 141 Hawaiʻi at 231 n.20, 407 P.3d at 187 n.20.  About the jury communications, the court stated:

> Here, it was evident that the jury wanted to reevaluate the testimony of Shayden McCandless and possibly compare it to the ballistic report as well as Dr. Happy's testimony.  From the Court's recollection of the testimony, the testimony of Shayden McCandless appears to be consistent with the testimony of Dr. Happy, rather than with Alexander Kinney.  And if the jury were to believe this testimony, then the (indiscernible) could be convicted as charged.

Under these circumstances, it was appropriate for the trial court to ask whether additional time to deliberate would assist the jury in reaching a unanimous verdict. See State v. Matavale, 115 Hawaiʻi 149, 156, 171-72, 166 P.3d 322, 329, 344-45 (2007) (Acoba, J., concurring) (endorsing "Would more time assist you in reaching a unanimous verdict?" as an appropriate response to the jury communication, "We are in a deadlock decision. What next?").

Kanae argues that upon receiving the jury's negative response, the trial court should have considered "less severe options" before declaring a mistrial, citing Minn and State v. Quitog, 85 Hawaiʻi 128, 938 P.2d 559 (1997).

In Minn, the deadlocked jury communicated that "further deliberations would not be of assistance without a transcript of Wheeler's testimony." 79 Hawaiʻi at 463, 903 P.2d at 1284. The option discussed in Minn was granting the jury's request for the transcript. Here, Kanae did not object to the trial court's responses declining the jury's requests for Kubo's ballistics report and Shayden's and Dr. Happy's testimony.

The other option discussed in Minn was reinstructing the jury, which had apparently not been given a copy of the jury instructions. Id. at 466-67, 903 P.2d at 1287-88. Here, the jury had its own copy of the jury instructions. Kanae did not ask the court to repeat any of the instructions to the jury.

In Quitog, the defendant was charged with attempted murder in the second degree. The jury was instructed on the

11

included offenses of attempted manslaughter, three degrees of assault, and reckless endangering. On the first day of deliberations the jury asked:

> How does the law interpret the explanation of Assault in the First Degree regarding bodily injury? Does the 'cause' of bodily injury apply to the intent of the assailant or to the outcome of the injury?

85 Hawaiʻi at 133–34, 938 P.2d at 564–65 (italics omitted).

The trial court responded, "Please refer to the jury instructions." Id. at 134, 938 P.2d at 565.

On the third day of deliberations, the jury asked for "further explanation, definition and/or example regarding reckless in order to distinguish between Assault 1 and Assault 2. The jury is hung without further information or understanding." Id. (italics omitted).

The court replied, "No further definition of Reckless can be provided. If the Court gives the jury additional time to deliberate, can the jury reach a unanimous verdict?" Id. (footnote omitted).

The jury responded, "No. . . . The jury is hung." Id.

The court declared a mistrial, finding there was manifest necessity. Id. at 135, 938 P.2d at 566.

The court denied Quitog's motion to dismiss the indictment, and allowed an interlocutory appeal. On the issue of manifest necessity, the supreme court stated:

> [A] trial court's declaration of a mistrial is not supported by manifest necessity if less severe options were available that would have protected both the defendant's rights and the public's interest.

12

> . . . For example, the trial court could have responded more substantively to the jury's [first] communication . . . by clarifying the fact that, in accordance with its instructions, . . . the states of mind requisite to the commission of assault in the first degree applied both to the defendant's conduct and to its result, i.e., "serious bodily injury." Additionally, and inasmuch as the jury had effectively exhibited its inability to reach a unanimous guilty verdict . . . the trial court could have instructed the jury to continue its deliberations regarding included offenses. On the record before us, however, we cannot say that the trial court's declaration of a mistrial based on manifest necessity constituted an abuse of discretion, and we therefore hold that it did not.

Id. at 143, 938 P.2d at 574 (cleaned up).

Here, Kanae did not ask the trial court to consider any other option when it informed him of its inclination to declare a mistrial. Nevertheless, the court did consider another option. It concluded:

> 7. The Hawaiʻi Supreme Court has expressly disapproved the giving of an Allen charge in criminal cases. State v. Fajardo, 67 Haw. 593, 600-01, 699 P.2d 20, 24-25 (1985).
>
> 8. Here, given the posture of the case and the nature of the jury's communications, the court only had two options on March 5, 2024: (1) force the jury to continue its deliberations notwithstanding the fact that it unequivocally said that additional time would not help or (2) declare a mistrial. There were no other less severe options available. See Minn, 79 Hawaiʻi at 465, 903 P.2d at 1286 ("Even though a 'hung jury' constitutes a 'classic example' of manifest necessity, a trial court must first consider less severe options available and balance the accused's rights against the public interest").
>
> 9. Pursuing option (1) would be tantamount to the court giving an Allen charge, which, under Fajardo, is forbidden. Thus, declaring a mistrial (option 2) was the only course of action available to the court.

The term "Allen charge" comes from Allen v. United States, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). There, the Supreme Court approved instructing a deadlocked jury

> that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a

13

> reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

Fajardo, 67 Haw. at 596–97, 699 P.2d at 22 (quoting Allen, 164 U.S. at 501).

In Fajardo, a deadlocked jury was instructed that if it couldn't "reach a verdict, this case must be tried again." 67 Haw. at 594, 699 P.2d at 21 (italics omitted). Each juror in the minority was instructed to "reconsider his views in the light of the opinion of" the majority, and jurors in the majority were instructed to "give equal consideration to the views of the minority." Id. at 595, 699 P.2d at 21 (italics omitted). One hour later, the jury reached what appeared to be a compromise verdict of guilty on an included offense. On appeal, the supreme court held it was error to give the Allen-like instruction. It hypothesized: "Had the trial court simply repeated an instruction given earlier to the jury on how to go about its deliberations,[2]

---

2    The instruction read:

> A verdict must represent the considered judgment of each juror, and in order to return a verdict, it is necessary that each juror agree thereto. In other words your verdict must be unanimous.

> Each of you must decide the case for yourself, but it is yourduty [sic] to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your h onest [sic] conviction as to the weight or effect of evidence for the mere purpose of returning a verdict.

Fajardo, 67 Haw. at 601 n.2, 699 P.2d at 25 n.2.

we feel that no prejudicial effect would have befallen Appellant." Id. at 601, 699 P.2d at 25.

Later, in Matavale, a jury deliberated for five hours over two days before communicating: "We are in a deadlock decision. What next?" 115 Hawaiʻi at 156, 166 P.3d at 329. The trial court instructed the jury: "Continue your deliberations. See page 16 of the instructions." Id. The instruction on page 16 was materially identical to the one endorsed in the Fajardo dictum. Id. Two hours later, the jury found the defendant guilty of Abuse of Family or Household Members. The defendant appealed. We affirmed based on Fajardo. State v. Matavale, No. 27476, 2006 WL 2361921 (Haw. App. Aug. 15, 2006) (SDO). The supreme court granted certiorari. A plurality reversed the conviction, holding the evidence was insufficient to disprove the defense of parental discipline. 115 Hawaiʻi at 168–69, 166 P.3d at 341–42. It held the Allen issue was moot.

One justice concurred in the result and expressed the view that the trial court's instruction was incorrect, endorsing the State's argument that instructing the jury to continue deliberating after it reported being deadlocked was just like the Allen "'dynamite instruction' said to blast a verdict out of a jury" rejected by Fajardo. Id. at 171-72, 166 P.3d at 344-45 (Acoba, J., concurring).

Two justices dissented, criticizing the plurality for usurping the jury's fact-finding function. Id. at 172, 166 P.3d at 345 (Nakayama, J., dissenting). The dissent also noted the

15

instruction given was "virtually identical to the instruction recommended in Fajardo" and was not an improper Allen-like instruction. Id. at 180, 166 P.3d at 353.

Here, Kanae did not ask that the jury be instructed to continue deliberating or to be told: "You are excused for today. Return tomorrow at 9:00 a.m." as it was in State v. Gonsalves, 108 Hawaiʻi 289, 291, 119 P.3d 597, 599 (2005), overruled on other grounds by, State v. Auld, 136 Hawaiʻi 244, 361 P.3d 471 (2015).

"Manifest necessity" exists when "it becomes no longer possible to . . . reach a fair result based upon the evidence." Wilmer, 97 Hawaiʻi at 244, 35 P.3d at 761. On the record in this case, we hold that upon receiving the jury's negative response when asked if additional time to deliberate would assist them to reach a unanimous verdict, the trial court acted within its broad discretion when it decided that manifest necessity justified a discharge of the jury and no less severe options were available. "[A] mistrial ordered sua sponte because of a true inability of the jury to agree upon a verdict represents the 'classic example' of manifest necessity." Moriwake, 65 Haw. at 52, 647 P.2d at 710.

**B. We need not decide whether Kanae consented to the trial court's declaration of a mistrial.**

Kanae challenges conclusion of law (**COL**) no. 11:

> 11. Defendant impliedly consented to the court declaration of a mistrial. On March 5, 2024, defense counsel represented Defendant and his double jeopardy interests. The court stated its intention to declare

> a mistrial.  Defense counsel did not object; instead, he agreed with the court.  Defendant "did not offer an alternative course to declaration of a mistrial. Instead, when asked for his position, [Defendant] expressly agreed with [the court's] plan."  Dequair, 136 Hawaiʻi at 93, 358 P.3d at 65.  Thus, the only plausible interpretation of defense counsel's position — i.e., that he agreed with the court — is that Defendant impliedly consented to the mistrial.

Kanae's motion to dismiss argued — through new defense counsel — that "all [former] defense counsel said was he agreed that IF the Court was going to declare a 'hung jury mistrial,' the Court would have to hold that such a declaration was based on 'manifest necessity' basically because Defendant was not moving for a mistrial based on a hung jury."  Former defense counsel (Merrill) did not submit a declaration, affidavit, or other statement attesting to his intent when he said "Mr. Kanae agrees with the court's position."

We need not decide whether Kanae impliedly consented to a mistrial because we hold that the trial court acted within its discretion when it decided that manifest necessity existed to declare a mistrial.  See Wilmer, 97 Hawaiʻi at 242–43, 35 P.3d at 759–60 ("A mistrial is properly declared and retrial is not barred by the defendant's right against double jeopardy where the defendant consented to the mistrial **or** there was manifest necessity for the mistrial." (emphasis added)).

> C.    **The trial court acted within its discretion when it denied Kanae's motion to dismiss the indictment.**

Kanae contends that even if manifest necessity for the mistrial existed, the trial court should have dismissed his indictment based on Moriwake.

17

In Moriwake, the defendant was tried twice for manslaughter, on essentially the same evidence, with both cases ending in hung-jury mistrials. After the second mistrial, Moriwake moved to dismiss the indictment. The trial court granted the motion. The State appealed. The appeal presented two issues: (1) was further prosecution barred by double jeopardy; and (2) did the trial court have discretion to dismiss the indictment and, if so, was it properly exercised? 65 Haw. at 50, 647 P.2d at 709.

On the first issue, the supreme court thought "it clear from the record that the reasons for which mistrials were declared in both prosecutions constituted 'classic examples' of 'manifest necessity[.]'" Id. at 54, 647 P.2d at 711. The court thus held that the constitutional proscription against double jeopardy "did not mandate dismissal of Moriwake's indictment." Id.; see also State v. Gouveia, 139 Hawaiʻi 70, 81, 384 P.3d 846, 857 (2016) ("In light of our ruling that the circuit court was within its discretion in concluding that manifest necessity existed, retrial . . . is not barred by double jeopardy."); State v. Dequair, 136 Hawaiʻi 71, 91, 358 P.3d 43, 63 (2015); Wilmer, 97 Hawaiʻi at 242–43, 35 P.3d at 759–60; cf. State v. Mayo, 62 Haw. 108, 111, 612 P.2d 107, 110 (1980) ("Where a mistrial is declared . . . and there is an absence of manifest necessity for the mistrial, a retrial will be barred by double jeopardy."); State v. Lam, 75 Haw. 195, 201, 857 P.2d 585, 589 (1993), overruled on other grounds by, Wilmer.

On the second issue, the supreme court held that "trial courts have the power to dismiss sua sponte an indictment with prejudice and over the objection of the prosecuting attorney." Moriwake, 65 Haw. at 55, 647 P.2d at 711. It listed six factors for trial courts to consider when "balancing the interest of the state against fundamental fairness to a defendant with the added ingredient of the orderly functioning of the court system." Id. at 56, 647 P.2d at 712-13. It ultimately held:

> In this case, two full, nearly identical trials on a serious charge were held, following which two separate juries were unable to reach a verdict despite sound judicial efforts to encourage a "considered judgment." There was no indication that a third trial would proceed in a manner any different than did the previous two. Considering this and other evidence in the record, we do not perceive the trial court to have abused its discretion in dismissing the indictment of Moriwake.

Id. at 57, 647 P.2d at 713.

Thus, Moriwake stands for two distinct propositions: (A) double jeopardy does not prohibit a retrial when a hung-jury mistrial is declared based on manifest necessity; and (B) even though a dismissal is not required under double jeopardy, a trial court has discretion to dismiss an indictment, over the State's objection, after considering (1) the severity of the offense charged; (2) the number of prior mistrials and the circumstances of the jury deliberation therein, so far as is known; (3) the character of prior trials in terms of length, complexity and similarity of evidence presented; (4) the likelihood of any substantial difference in a subsequent trial, if allowed; (5) the trial court's own evaluation of relative case strength; and

19

(6) the professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney. Id. at 56, 647 P.2d at 712-13.

> And:

>> Nothing in Moriwake indicates that all factors must be given equal weight or that certain factors must be given more weight than others. In reviewing the propriety of a trial court's exercise of its discretion to dismiss an indictment, this court accords deference to the conclusion of the trial court. We will not vacate a trial court's Moriwake ruling unless the party challenging the ruling can make a strong showing that the court abused its discretion by clearly exceeding the bounds of reason or disregarding rules or principles of law or practice.

Deedy, 141 Hawaiʻi at 224, 407 P.3d at 180 (cleaned up).

Here, the trial court concluded that each of the six Moriwake factors "weighs in favor of retrial." Kanae argues only about factors two and four.

**Factor 2**

Kanae challenges COL no. 15:

> 15. Factor 2 (the number of prior mistrials and the circumstances of jury deliberation therein, so far is known): There has been only one prior mistrial. The first jury deliberated for one-and-a-half days. This factor weighs in favor of retrial.

COL no. 15 was a mixed finding of fact and conclusion of law.

Kanae argues, "if it is really believable that the jury could legitimately be hung after only a day and a half of deliberations, it is very likely that the State has no case, and not very likely that another trial will produce a different

20

result." One could ask, "if the State really had no case, why didn't the jury unanimously acquit?"

Kanae's argument assumes the evidence presented in a retrial will be the same. But, as discussed below in connection with Factor 4, the assumption may be flawed.

The trial court's mixed finding and conclusion that Factor 2 weighed against dismissal was not clearly erroneous (there had only been one mistrial), applied the correct law (Moriwake), and was within its discretion under the circumstances of this case. See State v. Hinton, 120 Hawaiʻi 265, 278-79, 204 P.3d 484, 497-98 (2009) (stating that "second factor weighed in favor of a retrial" where "the jury had trouble following the evidence" and because "the case against Hinton was not a particularly complex case, there was a basis for concluding that another jury would be able to reach a verdict" (cleaned up)).

### Factor 4

Kanae challenges COL no. 17:

> 17.    Factor 4 (the likelihood of any substantial difference in a subsequent trial, if allowed):  While much of the State's evidence will be the same, if a retrial is allowed, the State's presentation and evidence will not be identical.  For example, the State will refine its presentation to address [Kanae]'s misidentification defense.  Additionally, if the court reconsiders its earlier ruling precluding evidence of a May 15, 2018 shooting, the evidentiary landscape will change in the State's favor.  Finally, in the event of a retrial, [Kanae] will have to establish Kinney's unavailability before his out-of-court statement is admitted as a statement against penal interest.  This factor weighs in favor o[f] retrial.

21

The trial court was referring to its order granting Kanae's motion in limine no. 7 to preclude the State from offering evidence that Kanae shot Thomas in the leg at Monuments on May 15, 2018 (four months before Thomas was killed), and its order allowing Kanae to introduce Kinney's recorded interview under Hawaii Rules of Evidence Rule 804(a)(5) after Kanae showed he was unable to procure Kinney's presence at trial by process or other reasonable means.

On the motion in limine, there was no dispute that Thomas had been shot in the thigh and groin, at Monuments, on May 15, 2018. Thomas identified Kanae to HPD as the shooter. During the evidentiary hearing, Kanae called two witnesses who testified that Kanae was not the shooter. The trial court ruled that "events of May 15, 2018, would confuse the jury and result in a trial within a trial."

Kanae argues the ruling would be the law of the case in any retrial. "Unless cogent reasons support the second court's action, any modification of a prior ruling of another court of equal and concurrent jurisdiction will be deemed an abuse of discretion." Gurrobat v. HTH Corp., 135 Hawaiʻi 128, 139, 346 P.3d 197, 208 (2015) (cleaned up).

Here, the trial court vacated its own order during the post-trial hearing on the State's motion for reconsideration based on new evidence (from a federal wiretap) that Kanae admitted shooting Thomas on May 15, 2018. The court specifically stated it was "not going to tie the hands of the trial judge that

22

will be" presiding over the retrial.[3] The court also noted that Shayden's trial testimony about how he knew Kanae had been limited, but if evidence of the May 15, 2018 shooting was admitted, Shayden would be allowed to testify that he "talked to his father about that incident and knew who Kaden Kanae was from that incident."

As to the order admitting Kinney's recorded interview, Kanae argues "there is no reason to believe that Kinney will not be as unavailable in the second trial as he was in the first so his confession will undoubtedly be admitted in a subsequent trial." Kanae will still have to make reasonable attempts to serve Kinney with a trial subpoena to establish his unavailability. If he does not, or if he is able to serve Kinney with a trial subpoena, he may not be able to play the video of Kinney's HPD interview to the next jury. And, as the trial court noted, if Kinney is served, his decision to testify or not testify "may change the landscape of this case."

The trial court acted within its discretion when it determined that Factor 4 "weighs in favor o[f] retrial." Kanae presents no argument against the court's findings and conclusions that the other four Moriwake factors weighed against a dismissal.

## IV. CONCLUSION

The August 21, 2024 *Findings of Fact, Conclusions of Law, and Order Denying Defendant's Motion to Dismiss Case for*

---

[3] The judge who presided over Kanae's trial was leaving the Hawai'i State Judiciary to become a United States district judge for the District of Hawai'i.

*Double Jeopardy Violation* is affirmed.  Kanae's May 21, 2026 *Request for Retention of Oral Argument* is denied.  This case is remanded to the circuit court for further proceedings.


On the briefs:

Samuel P. King, Jr.,
for Defendant-Appellant
Kaden K. Kanae.

Steven S. Alm,
Prosecuting Attorney,
Stephen K. Tsushima,
Deputy Prosecuting Attorney,
City & County of Honolulu,
for Plaintiff-Appellee
State of Hawaiʻi.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Sonja M.P. McCullen
Associate Judge